E-FILED
Friday, 10 April, 2020  05:43:42 PM
Clerk, U.S. District Court, ILCD

# Exhibit B



**INTRODUCING THE HARTFORD'S NEWLY UPDATED SUITE OF
EMPLOYMENT-RELATED RISK MANAGEMENT RESOURCES**

Dear Valued Customer,

We are pleased to share our newly updated suite of employment-related risk management resources, available in our **Hartford Help®** portal, and invite you to acquaint yourself with them.

In today's climate, allegations of sexual and workplace harassment and employment-related lawsuits have reached alarming levels. Even seasoned human resources professionals can face challenges in determining whether a particular employment decision is lawful or appropriate.

The resources in the **Hartford Help®** portal were designed with our policyholders in mind, with a primary goal of increasing their practical understanding of employment-related risks, while helping them to avoid potential lawsuits and control losses. Just a few of the resources available include HR training tools, sample HR policies, model handbooks, and interactive maps that outline key state laws based on the state of operation. These services are provided for The Hartford by a leading workplace law firm, Jackson Lewis P.C.

Additionally, you have access to the **Jackson Lewis Help Line at 1-866-620-0014** to speak with an attorney for general employment-related questions. If you want further assistance, you also have access to discounted rates from Jackson Lewis to assist with the development of preventative practices, preparing employee handbooks and training supervisors.

---

**Visit www.hartfordhelp.com**

**Your Invitation code: Welcome Hartford**

---

We hope you take advantage of these valuable services offered to The Hartford's Employment Practices Liability customers. As always, thank you for choosing The Hartford. Together we prevail.

*Please be advised that availing yourself of any of the services described herein will not constitute the filing of a notice of claim under any insurance policy, nor are any such services intended to be a replacement or substitute for your hiring of legal counsel. Jackson Lewis P.C. is an independent, third party law firm, and not a member company, subsidiary, or affiliate of The Hartford. Use of any of the services described herein is voluntary and solely at your own discretion.*

<u>TWIN CITY FIRE INSURANCE CO.</u>
<u>ONE COLLEGE PARK, INDIANAPOLIS, IN 46268-0930</u>
A stock insurance company, herein called the Insurer



# PRIVATE CHOICE PREMIER℠ POLICY

## DECLARATIONS

**Policy Number:** <u>83 KB 0336944-19</u>

**NOTICE: THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5 OF THE DECLARATIONS PROVIDE CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN: COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND WHICH HAS BEEN REPORTED TO THE INSURER IN ACCORDANCE WITH THE APPLICABLE NOTICE PROVISIONS. COVERAGE IS SUBJECT TO THE INSURED'S PAYMENT OF THE APPLICABLE RETENTION. PAYMENTS OF DEFENSE COSTS ARE SUBJECT TO, AND REDUCE, THE AVAILABLE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**ITEM 1: Named Entity and Address:**

> VONACHEN GROUP
> 8900 NORTH PIONEER ROAD
> PEORIA, IL 61615

**ITEM 2: Producer's Name and Address:**

> 81386
> A J GALLAGHER RISK MGMT SRVC I
> 101 S MAIN STREET SUITE 200
> DECATUR, IL 62523

**ITEM 3: Policy Period:**

> **(A)** Inception Date: 5/17/19

> **(B)** Expiration Date: 5/17/20

> 12:01 a.m. local time at the address shown in ITEM 1

**ITEM 4: Premium:**   <u>$29,104.00</u>

**ITEM 5: Liability Coverage Part Elections:**

Only those **Liability Coverage Parts** and Coverage Features that are designated with an "X" are included under this Policy.

☐   "Combined Aggregate Limit of Liability For All **Liability Coverage Parts**" $N/A
☐   "Defense Outside the Limit of Liability (100%)" for the following coverage parts:

> ☐  Directors, Officers and Entity Liability Coverage Part
> ☐  Employment Practices Liability Coverage Part
> ☐  Fiduciary Liability Coverage Part

If both the "Combined Aggregate Limit of Liability For All **Liability Coverage Parts**" and the "Defense Outside the Limit of Liability (100%)"options are selected, the maximum aggregate defense outside the limits paid by the Insurer shall be equal to 100% of the "Combined Aggregate Limit of Liability For All **Liability Coverage Parts**".

 © 2018, The Hartford

| COVERAGE PART | AGGREGATE LIMIT(S) OF LIABILITY (AND SUB-LIMITS OF LIABILITY, WHERE APPLICABLE) | RETENTION(S) | PRIOR OR PENDING DATE(S) |
|---|---|---|---|
| [X] **Directors, Officers and Entity Liability** | $ 1,000,000 | Insured Person Liability $0<br><br>Corporate Reimbursement $25,000 | 05/17/16<br><br>05/17/16 |
| *(Additional, Elective Coverage Features)* | | | |
| [X] *Entity Liability Coverage* | $1,000,000 | $25,000 | 05/17/16 |
| [X] *Investigation Costs* | Sub-Limit of Liability $500,000 | $0 | 05/17/16 |
| [X] *Additional Limit of Liability for Claims Against Managers* | $1,000,000 | $0 | 05/17/16 |
| [X] *Legal Services Wrongful Act* | Sub-Limit of Liability $1,000,000 | $25,000 | 05/17/16 |
| [X] *Data Privacy Event Expense Coverage* | Sub-Limit of Liability $50,000 | $0 | 05/17/16 |
| [X] **Employment Practices Liability** | $1,000,000 | $75,000 | 09/01/13 |
| *(Additional, Elective Coverage Features)* | | | |
| [X] *Third Party Liability Coverage* | Sub-Limit of Liability $1,000,000 | $75,000 | 09/01/13 |
| [X] *Wage and Hour Defense Cost Coverage Extension* | Sub-limit of Liability for Defense Costs: $250,000 | $75,000 | 09/01/13 |
| [X] *Workplace Violence Expenses Coverage Extension* | Sub-limit of Liability for Expenses: $250,000 | $0 | 09/01/13 |
| [X] *Training Costs* | Sub-limit of Liability for Training Costs: $1,000,000 | $75,000 | 09/01/13 |
| [X] **Fiduciary Liability** | $1,000,000 | $0 | 09/01/13 |
| *(Additional Elective Coverage Features)* | | | |
| [X] *Settlement Program Coverage* | Sub-Limit of Liability $250,000 | $0 | 09/01/13 |
| [X] *HIPAA:* | Sub-Limit of Liability $1,500,000 | $0 | |

**ITEM 6: Non-Liability Coverage Part Elections:**

Only those **Non-Liability Coverage Parts** that are designated with an "X" are included under this Policy

| COVERAGE PART | LIMIT(S) OF INSURANCE | RETENTION |
|---|---|---|
| [X] **Crime** | See Crime Coverage Part Dec. Page, Form No. <u>PP00H60100 0616</u> | See Crime Coverage Part Dec. Page, Form No. <u>PP00H60100 0616</u> |
| [ ] **Kidnap and Ransom/Extortion** | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. <u>N/A</u> | See Kidnap and Ransom/Extortion Coverage Part Dec. Page, Form No. <u>N/A</u> |

**ITEM 7: Extended Reporting Period:**

**(A)** Duration: 12 MONTHS  **(B)**   Premium*: 75%

\*   Premium for the Extended Reporting Period elected shall be the indicated percentage of the sum of the annual premium specified for all **Liability Coverage Parts** plus the annualized amounts of any additional premiums charged during the **Policy Period**. The Extended Reporting Period is not available for the **Non-Liability Coverage Parts**.

**ITEM 8: Endorsements:**

This Policy includes the following endorsements at issuance:

SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

**ITEM 9:  Address For Notices to Insurer:**

**For Claims other than Kidnap and Ransom/Extortion:**     **For all notices other than Claims:**

The Hartford
Claims Department
Hartford Financial Products
277 Park Ave., 16th Floor
New York, New York 10172
**HFPClaims@thehartford.com**
Fax: (917) 464-6000

The Hartford
Product Services
Hartford Financial Products
277 Park Ave., 16th Floor
New York, New York 10172
**HFPExpress@thehartford.com**
Fax: (866) 586-4550

*For <u>Kidnap and Ransom/Extortion Claims</u> see Kidnap and Ransom/Extortion Coverage Part Declarations.*

**ITEM 10: Cyber Coverage Part Election**

| [ ] **CyberChoice Premier Coverage Part** | See Dec. Page, Form No. N/A **for a guide to details relating to Cyber coverage.** |
|---|---|

This Policy shall not be valid unless countersigned by the Insurer's duly authorized representative.

GU207
(6-78)

# ENDORSEMENT

This endorsement, effective on 5/17/19 at 12:01 A.M standard time, forms a part of

Policy No.      83 KB 0336944-19 of the TWIN CITY FIRE INSURANCE CO.

Issued to      VONACHEN GROUP

*Douglas Elliot*

Douglas Elliot, President

### SCHEDULE

| | | | |
|---|---|---|---|
| | RN00N02600 | 5/93 | IN WITNESS PAGE |
| | PP00H00300 | 6/16 | PRIVATE CHOICE PREMIER POLICY |
| | PP00H30000 | 6/16 | DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART |
| | PP00H40000 | 6/16 | EMPLOYMENT PRACTICES LIABILITY COVERAGE PART |
| | PP00H50000 | 6/16 | FIDUCIARY LIABILITY COVERAGE PART |
| | PP00H60000 | 6/16 | CRIME COVERAGE PART |
| 1 | HG00H06802 | 1/15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| 2 | PP00H03200 | 6/16 | SPECIFIC PROCEEDING EXCLUSION |
| 3 | PP00H10700 | 4/17 | AMEND CANCELLATION PROVISION 20 DAYS NOTICE UNEARNED PREMIUM PRO RATA |
| 4 | PP00H10900 | 5/17 | SINGLE RETENTION CLAIMS COVERED UNDER MULTIPLE COVERAGE PARTS ENDORSEMENT |
| 5 | PP00H11100 | 5/17 | EXTENDED REPORTING PERIOD 90 DAY ELECTION PERIOD |
| 6 | PP00H11200 | 5/17 | AMEND DEFENSE AND SETTLEMENT ENDORSEMENT WITHIN RETENTION |
| 7 | PP00H11300 | 5/17 | AMEND DEFINITION OF SUBSIDIARY ADD CONTROLLED 501c(3) ORGANIZATIONS |
| 8 | PP00H33000 | 6/16 | AMENDED BODILY INJURY AND PROPERTY DAMAGE EXCLUSION NO EXCEPTIONS |
| 9 | PP00H34700 | 6/16 | MODIFIED UNFAIR TRADE PRACTICES EXCLUSION ENDORSEMENT |
| 10 | PP00H35000 | 6/16 | EXCLUSION FOR MANUFACTURING AND PROFESSIONAL SERVICE ENDORSEMENT |

GU207
(6-78)

# ENDORSEMENT

This endorsement, effective on 5/17/19 at 12:01 A.M standard time, forms a part of

Policy No.     83 KB 0336944-19 of the TWIN CITY FIRE INSURANCE CO.

Issued to     VONACHEN GROUP

*Douglas Elliot*

Douglas Elliot, President

### SCHEDULE

| | | | |
|---|---|---|---|
| 11 | PP00H35700 | 4/17 | INDEPENDENT CONTRACTOR EXTENSION WITH INDEMNIFICATION REQUIREMENT |
| 12 | PP00H35800 | 4/17 | AMEND DEFINITION OF ENTITY CLAIM INCLUDE COVERAGE FOR ADMINISTRATIVE |
| 13 | PP00H42000 | 6/16 | AMENDED BODILY INJURY AND PROPERTY DAMAGE EXCLUSION NO EXCEPTIONS |
| 14 | PP00H42600 | 6/16 | WORKPLACE VIOLENCE COVERAGE ENDORSEMENT |
| 15 | PP00H42900 | 6/16 | EMPLOYMENT CRISIS FUND SUBLIMIT ENDORSEMENT |
| 16 | PP00H43200 | 4/17 | AMENDED RETENTION WAIVER |
| 17 | PP00H43300 | 4/17 | AMENDED DEFINITION OF RETALIATION |
| 18 | PP00H43500 | 3/17 | AMEND NOTICE OF CLAIM SECTION VI (B)(2) |
| 19 | PP00H50301 | 5/17 | ORDER OF PAYMENTS |
| 20 | PP00H67200 | 2/17 | TELEPHONE AND TOLL FRAUD COVERAGE ENDORSEMENT (CRIME COVERAGE PART) |
| 21 | PP12H00400 | 6/16 | ILLINOIS AMENDATORY ENDORSEMENT |
| 22 | PP12H09500 | 6/16 | ILLINOIS CHANGES (CRIME COVERAGE PART) |
| 23 | PP12H09700 | 6/16 | ILLINOIS CHANGES (DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART) |
| 24 | PP12H09800 | 6/16 | ILLINOIS CHANGES (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART) |
| 25 | PP12H09900 | 6/16 | ILLINOIS CHANGES (FIDUCIARY LIABILITY COVERAGE PART) |
| 26 | HR12H00301 | 3/11 | ILLINOIS CANCELLATION AND NONRENEWAL ENDORSEMENT |

Rev. Ed. Date (04/02)
GU 207 (6-78)

**GU207**
**(6-78)**

# ENDORSEMENT

This endorsement, effective on 5/17/19 at 12:01 A.M standard time, forms a part of

Policy No.       83 KB 0336944-19 of the TWIN CITY FIRE INSURANCE CO.

Issued to        VONACHEN GROUP

*Douglas Elliot*

Douglas Elliot, President

SCHEDULE

| | | |
|---|---|---|
| HG00H05603 | 1/15 | CONFIRMATION OF ACCEPTANCE OF CERTIFIED ACTS OF TERRORISM |
| HG00H12900 | 10/16 | U.S. DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") |
| HR00H09300 | 2/07 | PRODUCER COMPENSATION NOTICE |
| HR12H00502 | 3/17 | IMPORTANT INFORMATION FOR ILLINOIS POLICYHOLDERS |



**THE HARTFORD**

# PRIVATE CHOICE PREMIER℠ POLICY
## CRIME COVERAGE PART
## DECLARATIONS

In return for the payment of the premium, and subject to all the terms of this **Non-Liability Coverage Part**, we agree with you to provide the insurance stated in this **Non-Liability Coverage Part**.

**ITEM:**

1. **Coverages, Limits of Insurance and Retentions:**

   Insuring Agreements, Limits of Insurance and Retention Amounts shown below are subject to all of the terms of this **Non-Liability Coverage Part** that apply.

| Insuring Agreements Forming Part of This Non-Liability Coverage Part | Limit(s) of Insurance | Retention Amount(s) |
|---|---|---|
| 1. Employee Theft | $1,000,000 | $25,000 |
| 2. Forgery or Alteration Including Credit Cards | $1,000,000 | $25,000 |
| 3. Inside The Premises - *Money, Securities and Other Property* | $1,000,000 | $25,000 |
| 4. Outside The Premises - *Money, Securities and Other Property* | $1,000,000 | $25,000 |
| 5. Computer and Funds Transfer Fraud | $1,000,000 | $25,000 |
| 6. Money Orders and Counterfeit Currency | $1,000,000 | $25,000 |
| 7. Computer Systems Restoration Expenses | $25,000 | $1,000 |
| 8. Identity Recovery Expenses Reimbursement | $25,000 | $250 |
| 9. Deception Fraud | $100,000 | $5,000 |
| 10. Theft Of Clients' Property Off Premises | $1,000,000 | $25,000 |
| 11. Investigative Expense Sublimit | $250,000 | $0 |

2. **Cancellation of Prior Insurance:** By acceptance of this **Non-Liability Coverage Part** you give us notice canceling prior policies or bonds numbered <u>N/A</u>. The cancellation(s) is effective at the time this **Non-Liability Coverage** Part becomes effective.

3. **Form Numbers of Endorsements Forming Part of This Non-Liability Coverage Part When Issued:** SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

# PRIVATE CHOICE PREMIER℠ POLICY

# COMMON TERMS AND CONDITIONS

<u>NOTICE</u>: **THE LIABILITY COVERAGE PARTS SCHEDULED IN ITEM 5 OF THE DECLARATIONS PROVIDE CLAIMS MADE COVERAGE. EXCEPT AS OTHERWISE SPECIFIED HEREIN: COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND WHICH HAS BEEN REPORTED TO THE INSURER IN ACCORDANCE WITH THE APPLICABLE NOTICE PROVISIONS. COVERAGE IS SUBJECT TO THE INSURED'S PAYMENT OF THE APPLICABLE RETENTION. PAYMENTS OF DEFENSE COSTS ARE SUBJECT TO, AND REDUCE, THE AVAILABLE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

In consideration of the payment of the premium, the Insurer and the Insureds agree as follows:

## I.  TERMS AND CONDITIONS

**(A)** All Coverage Parts included in this Policy are subject to the following Common Terms and Conditions. If any provision in these Common Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

**(B)** Except as otherwise provided by specific reference to other Coverage Parts, the terms and conditions of each Coverage Part shall apply only to such Coverage Part.

## II.  COMMON DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

- **"Affiliate"** means any insurance company controlling, controlled by or under common control with the Insurer.
- **"Application"** means the application for this Policy, including any (i) materials or information submitted therewith or made available to the Insurer during the underwriting process, or (ii) warranty, representation or other statement provided to the Insurer, which application shall be on file with the Insurer. Such **Application** shall be deemed a part of this Policy and attached hereto.
- **"Claim"** shall have the meaning specified for such term in each Coverage Part.
- **"Controlled Partnership"** means a limited partnership in which and so long as the **Named Entity** owns or controls, directly or indirectly, more than 50% of the limited partnership interest and an **Insured Entity** is the sole general partner.
- **"Damages"** shall have the meaning specified for such term in each Coverage Part.
- **"Debtor in Possession"** means a "debtor in possession" as such term is defined in Chapter 11 of the U.S. Bankruptcy Code as well as any equivalent status under any similar law, including outside of the United States.
- **"Defense Costs"** means:

  **(1)** reasonable legal fees and expenses including but not limited to e-discovery expenses, incurred in the defense or appeal of a **Claim**;

  **(2)** **Extradition Costs**; or

  **(3)** the costs of appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to furnish such bonds.

  However, **Defense Costs** shall not include:

  **(a)** salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds**;

  **(b)** any fees, expenses or costs which are incurred by or on behalf of a party which is not a covered **Insured**; or

    **(c)** any fees, expenses or costs which were incurred prior to the date on which the Insurer received written notice of **Claim** from the **Insured**.

- **"Domestic Partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or any domestic partner relationship arrangement recognized outside of the U.S. and under the Human Resource policy of the **Insured Entity**.

- **"Effective Time"** means the actual time that a transaction is legally consummated as evidenced by the controlling documents of the transaction, including but not limited to the purchase and sale agreement, merger agreement, partnership agreement, or trust agreement.

- **"Employee"** means any natural person who was, is or shall become a(n):

    **(1)** employee of an **Insured Entity** including any full time, part time, seasonal, temporary, leased, or loaned employee; or

    **(2)** volunteer or intern with an **Insured Entity**.

    However, this definition of **Employee** shall hereby expressly not apply for purposes of the **Non-Liability Coverage Parts**.

- **"ERISA"** means the Employee Retirement Income Security Act of 1974.

- **"Extradition Costs"** means reasonable and necessary fees and expenses directly resulting from a **Claim** in which an **Insured Person** opposes, challenges, resists or defends against any request for the extradition of such **Insured Person** from his or her current country of employ and domicile to any other country for trial or otherwise to answer any criminal accusation, including the appeal of any order or other grant of extradition of such **Insured Person**.

- **"Financial Insolvency"** means the status of an **Insured Entity** as a result of:

    **(1)** the appointment of any conservator, liquidator, receiver, rehabilitator, trustee, or similar official to control, supervise, manage or liquidate such **Insured Entity**; or

    **(2)** such **Insured Entity** becoming a **Debtor in Possession**.

- **"Insured Entity"** means:

    **(1)** the **Named Entity;** or

    **(2)** any **Subsidiary**.

    **Insured Entity** shall include any such entity as a **Debtor in Possession**.

    **Insured Entity** shall also include any such entity in its capacity as a general partner of a **Controlled Partnership**.

- **"Insured Person"** shall have the meaning specified for such term in each Coverage Part.

- **"Insureds"** shall have the meaning specified for such term in each Coverage Part.

- **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, or transaction, or series of causally connected facts, circumstances, situations, events, or transactions.

- **"Liability Coverage Part"** means the Directors, Officers and Entity Liability, Employment Practices Liability, and Fiduciary Liability Coverage Parts, if included in ITEM 5 of the Declarations.

- **"Loss"** means **Defense Costs** and **Damages.**

- **"Manager"** means any natural person who was, is or shall become a(n):

    **(1)** duly elected or appointed director, advisory director, board observer, advisory board member, officer, member of the board of managers or management committee member of an **Insured Entity;**

    **(2)** **Employee** in his/her capacity as legal counsel to an **Insured Entity;** or

**(3)** executive of an **Insured Entity** created outside the U.S. to the extent that such executive holds a position equivalent to those described in (1) or (2) above.

However, this definition of **Manager** shall hereby expressly not apply for the purposes of the Kidnap and Ransom/ Extortion Coverage Part.

- **"Named Entity"** means the entity named in ITEM 1 of the Declarations.
- **"Non-Liability Coverage Part"** means the Crime and Kidnap and Ransom/Extortion Coverage Parts, if included in ITEM 6 of the Declarations.
- **"Notice Managers"** shall have the meaning specified for such term in each Coverage Part.
- **"Policy Period"** means the period from the Inception Date to the Expiration Date set forth in ITEM 3 of the Declarations or any earlier cancellation date.
- **"Pollutants"** means any solid, liquid, gaseous or thermal irritant, nuisance or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalies, chemicals, odors, noise, lead, oil or oil product, radiation, asbestos or asbestos-containing product, waste and any electric, magnetic or electromagnetic field of any frequency. Waste includes, without limitation, material to be recycled, reconditioned or reclaimed. **Pollutants** also means any substance located anywhere in the world identified on a list of hazardous substances issued by any federal agency (including, nonexclusively, the Environmental Protection Agency) or any state, county, municipality or locality or counterpart thereof, or any foreign equivalent thereof.
- **"Qualified Public Report"** means the public description of an occurrence that is covered only under a **Non-Liability Coverage Part** included under this Policy, which description also:

  **(1)** includes the legal identity of an Insured implicated in the coverage determination under such Non-Liability Coverage Part;

  **(2)** is broadcast by an on-the-air television or radio newscast, or published in a daily-circulated newspaper, or any official website thereof; and

  **(3)** first occurs during the Policy Period.

  However, **Qualified Public Report** does not mean any description by a source that does not employ a staff of journalists to report the news, or any description by or in any blog or social media.

- **"Subsidiary"** means any:

  **(1)** corporation in which and so long as the **Named Entity** owns or controls, directly or indirectly, more than 50% of the outstanding securities representing the right to vote for the election of the board of directors of such corporation;

  **(2)** limited liability company in which and so long as the **Named Entity** owns or controls, directly or indirectly, the right to elect, appoint or designate more than 50% of such entity's managing members;

  **(3)** a **Controlled Partnership**;

  **(4)** corporation operated as a joint venture in which and so long as the **Named Entity** owns or controls, directly or indirectly, exactly 50% of the issued and outstanding voting stock and which, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock of such corporation, the **Named Entity** solely controls the management and operation of such corporation; or

  **(5)** foundation, charitable trust or political action committee in which and so long as such entity or organization is controlled by the **Named Entity** or any **Subsidiary** as defined (1) through (4) above.

- **"Wage and Hour Violation"** means any actual or alleged violation of the duties and responsibilities that are imposed upon an **Insured** by any federal, state or local law or regulation anywhere in the world, including but not limited to the Fair Labor Standards Act or any similar law (except the Equal Pay Act), which govern wage, hour and payroll practices. Such practices include but are not limited to:

(1) the calculation and payment of wages, overtime wages, minimum wages and prevailing wage rates;

(2) the calculation and payments of benefits;

(3) the classification of any person or organization for wage and hour purposes;

(4) reimbursing business expenses;

(5) the use of child labor; or

(6) garnishments, withholdings and other deductions from wages.

- **"Wrongful Act"** shall have the meaning specified for such term in each Coverage Part.

## III. COVERAGE EXTENSIONS

### (A) Spousal/Domestic Partner Liability Coverage

Coverage shall apply to the lawful spouse or **Domestic Partner** of an **Insured Person** for a **Claim** made against such spouse or **Domestic Partner**, provided that:

(1) such **Claim** arises solely out of:

    (a) such person's status as the spouse or **Domestic Partner** of an **Insured Person;** or

    (b) such spouse or **Domestic Partner's** ownership of property sought as recovery for a **Wrongful Act**;

(2) the **Insured Person** is named in such **Claim** together with the spouse or **Domestic Partner**; and

(3) coverage of the spouse or **Domestic Partner** shall be on the same terms and conditions, including any applicable Retention, as apply to coverage of the **Insured Person** for such **Claim**.

No coverage shall apply to any **Claim** for a **Wrongful Act** of such spouse or **Domestic Partner**.

### (B) Estates and Legal Representatives

In the event of the death, incapacity or bankruptcy of an **Insured Person,** any **Claim** made against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** shall be deemed to be a **Claim** made against such **Insured Person**. No coverage shall apply to any **Claim** for a **Wrongful Act** of such estate, heirs, legal representatives or assigns.

### (C) Public Relations Reimbursement Extension - Non-Liability Coverage Parts Solely with respect to all Non-Liability Coverage Parts:

If, during the **Policy Period**, the **Insured Entity** notifies the Insurer in writing of a **Qualified Public Report** within sixty (60) days of the first broadcast or publication thereof, then, subject to the Insurer's prior written consent, such consent not to be unreasonably withheld, the **Named Entity** shall be entitled to reimbursement for up to $10,000 of reasonable and necessary public relations expenses incurred to mitigate the effects of the **Qualified Public Report;** provided further that:

(1) all **Qualified Public Reports** that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies or causes are deemed one **Qualified Public Report** first occurring on the date of the first such broadcast or publication thereof; and

(2) the $10,000 coverage provided by this extension shall:

**(a)** be the maximum aggregate amount that the Insurer shall pay under this Policy for all **Qualified Public Reports;** and

**(b)** only be available for reimbursement if the **Insured Entity** has exhausted any retention applicable to coverage for such occurrence giving rise to the **Qualified Public Report**. At such time as such applicable retention is exhausted, there shall be no further retention applicable to the coverage provided by this extension.

## IV.  LIMIT OF LIABILITY

**(A)** The Limit of Liability for each **Liability Coverage Part** in ITEM 5 of the Declarations shall be the maximum aggregate amount that the Insurer shall pay under such Coverage Part for all **Loss** from all **Claims** covered under such Coverage Part.

**(B)** Notwithstanding the above, if a Combined Aggregate Limit of Liability For All Coverage Parts is included in ITEM 5 of the Declarations, then:

**(1)** the Combined Aggregate Limit of Liability For All Coverage Parts shall be the maximum aggregate amount that the Insurer shall pay for all **Loss** from all **Claims** covered under all included **Liability Coverage Parts** combined; and

**(2)** any amount specified as a Limit of Liability for any individual **Liability Coverage Part** in ITEM 5 of the Declarations shall be part of, and not in addition to, the amount stated as the Combined Aggregate Limit of Liability For All Coverage Parts.

**(C)** If any Limit of Liability or Limit of Insurance is exhausted, the premium for this Policy shall be deemed fully earned.

## V.  DEFENSE COSTS

Solely with respect to all **Liability Coverage Parts:**

**(A)** **Defense Costs** shall be part of, and not in addition to, each applicable Limit of Liability.  Payment of **Defense Costs** by the Insurer shall reduce each Limit of Liability.

**(B)** Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then payment of **Defense Costs** shall be in addition to such applicable Limit of Liability, provided that:

**(1)** if the Combined Aggregate Limit of Liability For All Coverage Parts is not included in ITEM 5 of the Declarations, then the maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under a **Liability Coverage Part** shall be equal to the Aggregate Limit of Liability for such **Liability Coverage Part.**

**(2)** if a Combined Aggregate Limit of Liability For All Coverage Parts is included in Item 5 of the Declarations, then the maximum aggregate amount that the Insurer shall pay for all **Defense Costs** from all **Claims** covered under all included **Liability Coverage Parts** combined shall be equal to the Combined Aggregate Limit of Liability.

**(3)** if the amount available for **Defense Costs** stated in (1) or (2) above is exhausted by the payment of **Defense Costs**, then **Defense Costs** shall be paid by the Insurer out of any remaining applicable Limit of Liability until the exhaustion of the applicable Limit of Liability.

## VI.  RETENTION

Solely with respect to all **Liability Coverage Parts:**

**(A)** The Insurer shall pay **Loss** in excess of the Retention applicable to each **Claim** as specified in ITEM 5 of the Declarations.

**(B)** All Retentions shall be borne by the **Insureds** at their own risk; though where allowable by law, actual payment for a retention may be made on behalf of the **Insured** by a non-**Insured**. Payment by a non-**Insured** must contain a written reference to the identification number of the matter for which such payment is being made.

**(C)** The Retention shall apply to **Defense Costs** covered under this Policy. If, any **Defense Costs** are incurred by the Insurer prior to the **Insured's** complete payment of the Retention, then the **Insureds** shall reimburse the Insurer therefor upon request**.**

**(D)** If a **Claim** is covered under more than one Coverage Part, the applicable Retention for each Coverage Part shall be applied separately to such **Claim**, provided that the maximum Retention applied to such **Claim** shall not exceed the highest of such applicable Retentions.

**(E)** No Retention shall apply to **Loss** incurred by any **Insured Person** that an **Insured Entity** is not permitted by common or statutory law to indemnify, or is permitted or required to indemnify, but is not able to do so by reason of **Financial Insolvency.**

**(F)** If an **Insured Entity** is permitted or required by common or statutory law to indemnify an **Insured Person** for any **Loss,** or to advance **Defense Costs** on their behalf, and does not do so other than because of **Financial Insolvency**, then such **Insured Entity** and the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the Retention that would have applied if such indemnification had been made.

**(G)** If a **Subsidiary** is unable to indemnify an **Insured Person** for any **Loss**, or to advance **Defense Costs** on their behalf, because of **Financial Insolvency**, then the **Named Entity** shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such **Loss** up to the amount of the applicable Retention that would have applied if such indemnification had been made.

## VII.   DEFENSE AND SETTLEMENT

Solely with respect to all **Liability Coverage Parts:**

**(A)** The Insurer shall have the right and duty to defend **Claims** covered under the Policy, even if such **Claim** is groundless, false or fraudulent, provided that:

   **(1)** the **Insureds** give notice to the Insurer in accordance with the applicable **Liability Coverage Parts'** notice provisions; and

   **(2)** such **Claim** does not involve allegations, in whole or in part, of a **Wage and Hour Violation.**

For any **Claim** involving allegations, in whole or in part, of a **Wage and Hour Violation**, it shall be the duty of the **Insureds**, and not the Insurer, to defend such **Claim**.

**(B)** If the Insurer has the duty to defend a **Claim**, the Insurer's duty to defend such **Claim** shall cease upon exhaustion of any applicable Limit of Liability.

Notwithstanding the above, if Defense Outside the Limit of Liability is included in ITEM 5 of the Declarations, then the Insurer's duty, if any, to defend any **Claim** shall cease upon exhaustion of the maximum aggregate amount of **Defense Costs** available under Section V. DEFENSE COSTS, and any applicable Limit of Liability.

**(C)** The **Insureds** shall not admit or assume any liability, make any settlement offer or enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any admission, assumption, settlement offer or agreement, stipulation, or **Defense Costs** to which it has not consented.

**(D)** The Insurer shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this Policy. The Insurer may make any investigation it deems appropriate in connection with any **Claim**. The Insurer may, with the written consent of the **Insureds**, settle any **Claim** for a monetary amount that the Insurer deems reasonable.

**(E)** Notwithstanding the above, if Defense Outside the Limit of Liability is included in Item 5 of the Declarations, then the Insurer may, with the written consent of the **Insureds**, settle any **Claim** for a monetary amount that the Insurer deems

reasonable. However, if an **Insured** fails or refuses to consent to the settlement of a **Claim** as recommended by the Insurer and acceptable to a claimant, then:

  **(1)** the Insurer's duty to defend such **Claim**, if any, shall cease; and

  **(2)** subject to the applicable Limit of Liability, the Insurer's maximum liability for such **Claim** shall be limited to the sum of:

    **(a)** **Defense Costs** incurred up until such failure or refusal; plus

    **(b)** 80% of **Defense Costs** incurred after such failure or refusal; plus

    **(c)** **Loss** other than **Defense Costs** incurred to resolve such **Claim,** provided that if such amount exceeds the settlement amount recommended by the Insurer that the Insurer shall only be liable for 80% of the amount of such **Loss** in excess of such settlement amount.

**(F)** The **Insureds** shall give to the Insurer all information and cooperation as the Insurer may reasonably request. However, if the Insurer is, in its sole discretion, able to determine coverage for cooperating **Insureds**, the failure of one **Insured Person** to cooperate with the Insurer shall not impact coverage provided to cooperating **Insureds.**

**(G)** With respect to a covered **Claim** for which the Insurer does not have the duty to defend, the Insurer shall advance **Defense Costs** in accordance with section XI (B) that the Insurer believes to be covered under this Policy until a different allocation is negotiated, mediated, arbitrated or judicially determined.

## VIII. MINIMUM STANDARDS

In the event that there is an inconsistency between:

**(A)** the terms and conditions that are required to meet minimum standards of a state's law (pursuant to a state amendatory endorsement attached to this Policy), and

**(B)** any other term or condition of this Policy,

it is understood and agreed that, where permitted by law, the Insurer shall apply those terms and conditions of (A) or (B) above that are more favorable to the **Insured.**

## IX. EXTENDED REPORTING PERIOD

Solely with respect to all **Liability Coverage Parts:**

**(A)** If any **Liability Coverage Part** is cancelled or non-renewed for any reason other than non-payment of premium, the **Insureds** shall have the right to elect an extension of time to report **Claims** under such **Liability Coverage Part** (the "Extended Reporting Period").

**(B)** To elect the Extended Reporting Period, the **Insureds** shall send a written notice of election of the Extended Reporting Period to the Insurer together with the premium therefor. The right to elect the Extended Reporting Period shall end unless the Insurer receives such notice and premium within sixty (60) days of cancellation or non-renewal. There shall be no right to elect the Extended Reporting Period after such time.

**(C)** The premium for the Extended Reporting Period shall be that percentage specified in ITEM 7 of the Declarations of the sum of the original annual premium plus the annualized amount of any additional premium charged by the Insurer during the **Policy Period**. Such premium shall be deemed fully earned at the inception of the Extended Reporting Period.

**(D)** The Extended Reporting Period shall be for the duration specified in ITEM 7 of the Declarations following the end of the **Policy Period**.

**(E)** Coverage during the Extended Reporting Period shall apply to **Claims** made during the Extended Reporting Period for **Wrongful Acts** occurring prior to the earlier of the end of the **Policy Period** or the time of any transaction described

in Section XIV. CHANGES IN EXPOSURE, (C) Takeover of Named Entity. No coverage shall apply for any **Wrongful Act** occurring after such time.

**(F)** There is no separate or additional Limit of Liability for any Extended Reporting Period.

**(G)** If during the Extended Reporting Period the **Insureds** first become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim**, and if written notice of such **Wrongful Act** is given to the Insurer during the Extended Reporting Period, including the reasons for anticipating such a **Claim**, the nature and date of the **Wrongful Act**, the identity of the  **Insureds** allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act**, then any **Claim** subsequently made which arises from such **Wrongful Act** shall be deemed to be a **Claim** first made during the Extended Reporting Period, and therefore subject to the terms and conditions of this Policy, including, without limitation, Section VII., of these Common Terms and Conditions and the reporting requirements set forth in the NOTICE OF CLAIM provisions of this Policy, on the date that the Insurer receives the above notice.

## X.    INTERRELATIONSHIP OF CLAIMS

Solely with respect to all **Liability Coverage Parts:**

All **Claims** based upon, arising from or in any way related to the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** for all purposes under this Policy first made on the earliest date that:

**(A)** any of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period;**

**(B)** notice of any **Wrongful Act** described above was given to the Insurer under this Policy pursuant to the section titled NOTICE OF CLAIM found in the applicable **Liability Coverage Part;** or

**(C)** notice of any **Wrongful Act** described above was given under any prior management liability insurance policy if such notice is accepted under such other policy.

## XI.    ALLOCATION

Solely with respect to all **Liability Coverage Parts:**

Where **Insureds** who are afforded coverage for a **Claim** incur an amount consisting of both **Loss** that is covered by this Policy and also loss that is not covered by this Policy because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

**(A)** with respect to a covered **Claim** for which the Insurer has the duty to defend:

**(1)** 100% of the **Insured's Defense Costs** shall be allocated to covered **Loss**; and

**(2)** All other **Loss** shall be allocated between covered **Loss** and non-covered loss based upon the relative legal exposure of all parties to such matters.

**(B)** with respect to a covered **Claim** for which the Insurer does not have the duty to defend, all **Loss** shall be allocated between covered **Loss** and non-covered loss based upon the relative legal exposure of all parties to such matters.

## XII.    OTHER INSURANCE

If **Loss** arising from any **Claim** is insured under any other valid and collectible policy or policies, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number. Any payments made under any such policy(ies) will serve to offset any applicable retention amounts set forth in the Declarations.

## XIII.    CANCELLATION

**(A)** The Insurer may cancel this Policy for non-payment of premium by sending not less than 10 days notice to the **Named Entity**. This Policy may not otherwise be cancelled by the Insurer.

**(B)** Except as provided in Section XIV. CHANGES IN EXPOSURE, (C) Takeover of Named Entity, the **Insureds** may cancel this Policy by sending written notice of cancellation to the Insurer. Such notice shall be effective upon receipt by the Insurer unless a later cancellation time is specified therein.

**(C)** If the Insurer cancels this Policy, unearned premium shall be calculated on a pro rata basis. If the **Insureds** cancel this Policy, unearned premium shall be calculated at the Insurer's customary short rates. Payment of any unearned premium shall not be a condition precedent to the effectiveness of a cancellation. The Insurer shall make payment of any unearned premium as soon as practicable.

## XIV.  CHANGES IN EXPOSURE

Solely with respect to all **Liability Coverage Parts:**

**(A) Acquisitions or Created Subsidiaries**

If, before or during the **Policy Period**, any **Insured Entity** acquires or creates a **Subsidiary,** then such acquired or created entity and its subsidiaries, and any natural persons that would qualify as **Insured Persons** thereof, shall be **Insureds** to the extent such entities and persons would otherwise qualify as **Insureds** under the **Liability Coverage Parts**, but only for **Wrongful Acts** occurring after the **Effective Time** of such acquisition or creation. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before the **Effective Time** of such acquisition or creation, or for any **Interrelated Wrongful Acts** thereto.

However, if the fair value of the assets of any such acquired or created entity exceed 35% of the total assets of the **Named Entity** as reflected in its most recent consolidated financial statements prior to the **Effective Time** of such acquisition or creation, then the **Insureds** shall give the Insurer written notice and full, written details of the acquisition or creation as soon as practicable.

**(1)** prior to the expiration or termination date of this Policy; or

**(2)** within ninety (90) days of such acquisition or creation

whichever date is later.

There shall be no coverage under any renewal or replacement of this Policy for any such new **Subsidiary** and its subsidiaries, and any natural persons that would qualify as **Insured Persons** thereof, unless the **Insureds** comply with the terms of this provision.

**(B) Mergers**

If, before or during the **Policy Period**, any **Insured Entity** merges with another entity such that the **Insured Entity** is the surviving entity, then such merged entity and its subsidiaries, and any natural persons that would qualify as **Insured Persons** thereof, shall be **Insureds** to the extent such entities and persons would otherwise qualify as **Insureds** under the **Liability Coverage Parts**, but only for **Wrongful Acts** occurring after such merger. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before the **Effective Time** of such merger or for any **Interrelated Wrongful Acts** thereto.

However, if the fair value of the assets of any newly merged entity exceed 35% of the total assets of the **Named Entity** as reflected in its most recent consolidated financial statements prior to such merger, then the **Insureds** shall give the Insurer written notice and full, written details of the merger as soon as practicable

**(1)** prior to the expiration or termination date of this Policy; or

**(2)** within ninety (90) days of such acquisition or creation

whichever date is later.

© 2016, The Hartford

There shall be no coverage under any renewal or replacement of this Policy for any such new **Subsidiary** and its subsidiaries, and any natural persons that would qualify as **Insured Persons** thereof, unless the **Insureds** comply with the terms of this provision.

**(C) Takeover of Named Entity**

If, before or during the **Policy Period**:

**(1)** the **Named Entity** merges into or consolidates with another entity such that the **Named Entity** is not the surviving entity; or

**(2)** more than 50% of the securities representing the right to vote for the **Named Entity's** board of directors or managers is acquired by another person or entity, group of persons or entities, or persons and entities acting in concert,

then coverage shall continue under the **Liability Coverage Parts**, but only for **Wrongful Acts** occurring before the **Effective Time** of any such transaction. No coverage shall be available for any **Wrongful Act** occurring after the **Effective Time** of such transaction. Upon such transaction, this Policy shall not be cancelled and the entire premium for this Policy shall be deemed fully earned. The Insured shall give the Insurer written notice and full, written details of such transaction as soon as practicable. If any transaction described herein occurs, then the Insurer will not be obligated to offer any renewal or replacement of this Policy.

**(D) Loss of Subsidiary Status**

If, before or during the **Policy Period**, any entity ceases to be a **Subsidiary**, then coverage shall be available under the **Liability Coverage Parts** for such **Subsidiary** and its **Insured Persons**, but only for a **Wrongful Act** of such **Insureds** occurring before the **Effective Time** of such transaction. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after the **Effective Time** such transaction.

**XV.  SUBROGATION**

**(A)** The Insurer shall be subrogated to all of the **Insureds'** rights of recovery regarding any payment of **Loss** by the Insurer under this Policy. The **Insureds** shall execute all papers required and do everything necessary to secure and preserve such rights, including the execution of any documents necessary to enable the Insurer to effectively bring suit in the name of the **Insureds**. The **Insureds** shall do nothing to prejudice the Insurer's position or any potential or actual rights of recovery.

**(B)** Solely with respect to all **Liability Coverage Parts,** the Insurer shall not exercise its rights of subrogation against an **Insured Person** under this Policy unless such **Insured Person** has:

**(1)** obtained any personal profit, remuneration or advantage to which such **Insured Person** was not legally entitled, or

**(2)** committed a criminal or deliberately fraudulent act or omission or any willful violation of law,

if a judgment or other final adjudication establishes such personal profit, remuneration, advantage, act, omission, or violation.

**XVI.  APPLICATION**

**(A)** The **Insureds** represent that the declarations and statements contained in the **Application** are true, accurate and complete. This Policy is issued in reliance upon the **Application**.

**(B)** If the **Application** contains intentional misrepresentations or misrepresentations that materially affect the acceptance of the risk by the Insurer:

**(1)** For the purpose of determining coverage under all Coverage Parts other than the Directors, Officers and Entity Liability Coverage Part, no coverage shall be afforded under this Policy for any **Insureds** who knew on the Inception Date of this Policy of the facts that were so misrepresented, provided that:

    **(a)** knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**; and

    **(b)** knowledge possessed by any chief executive officer, general counsel, chief financial officer, human resources director or any position equivalent to the foregoing of the **Named Entity**, or anyone signing the **Application,** shall be imputed to all **Insured Entities**. No other person's knowledge shall be imputed to an **Insured Entity**.

**(2)** For the purpose of determining coverage under the Directors, Officers and Entity Liability Coverage Part, no coverage shall be afforded under this Policy for:

    **(a)** any **Insured Persons,** under Insuring Agreement (A), who knew as of the Inception Date of this Policy the facts that were so misrepresented in the **Application**, provided, however, that knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person.**

    **(b)** an **Insured Entity**, under Insuring Agreement (B), to the extent it indemnifies any **Insured Person** referenced in subparagraph (2)(a), above, and

    **(c)** an **Insured Entity**, under Insuring Agreements (C) and (D), if any chief executive officer, chief financial officer or any position equivalent to the foregoing of the **Named Entity**, or anyone signing the **Application,** knew as of the Inception Date of this Policy the facts that were so misrepresented in the **Application**.

    However, notwithstanding the foregoing, under no circumstances shall the Insurer be entitled to rescind this Policy.

## XVII. ACTION AGAINST THE INSURER

**(A)** Solely with respect to all **Liability Coverage Parts:**

    **(1)** No action shall be taken against the Insurer unless there shall have been full compliance with all the terms and conditions of this Policy.

    **(2)** No person or organization shall have any right under this Policy to join the Insurer as a party to any **Claim** against the **Insureds** nor shall the Insurer be impleaded by the **Insureds** in any such **Claim**.

**(B)** Solely with respect to the **Crime Coverage Part**:

    **(1)** No legal action shall be taken against the Insurer involving loss unless the **Insured** has complied with all the terms of this Policy; and

    **(2)** No legal action shall be taken against the Insurer involving loss until ninety (90) days after the **Insured** has filed proof of loss with us; and

    **(3)** No legal action shall be taken against the Insurer involving loss unless such action is brought within two (2) years from the date that the **Insured** discovers such loss.

**(C)** Solely with respect to the **Kidnap And Ransom/Extortion Coverage Part**:

    No suit, action or proceeding for recovery of any claim under this Policy shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this Policy shall have been complied with and the same be commenced within twenty-four (24) months after a claim for actual loss or expenses has been reported to the Insurer by the **Insured**.

## XVIII. ASSIGNMENT

Assignment of interest under this Policy shall not bind the Insurer without its consent as specified in a written endorsement issued by the Insurer to form a part of this Policy.

## XIX. BANKRUPTCY OR INSOLVENCY

Bankruptcy or insolvency of any **Insureds** shall not relieve the Insurer of any of its obligations under this Policy.

## XX.  AUTHORIZATION OF NAMED ENTITY

The **Named Entity** shall act on behalf of all **Insureds** with respect to all matters under this Policy, including, without limitation, giving and receiving of notices regarding **Claims**, cancellation, election of the Extended Reporting Period, payment of premiums, receipt of any return premiums, and acceptance of any endorsements to this Policy.

## XXI.  CHANGES

This Policy shall not be changed or modified except in a written endorsement issued by the Insurer to form a part of this Policy.

## XXII.  ENTIRE AGREEMENT

This Policy, including the Declarations, Common Terms and Conditions, included Coverage Part(s), **Application** and any written endorsements attached hereto, constitute the entire agreement between the **Insureds** and the Insurer relating to this insurance.

## XXIII. NOTICE ADDRESSES

**(A)** All notices to the **Insureds** shall be sent to the **Named Entity** at the address specified in ITEM 1 of the Declarations.

**(B)** All notices to the Insurer shall be sent to the address specified in ITEM 9 of the Declarations. Any such notice shall be effective upon receipt by the Insurer at such address.

## XXIV. HEADINGS

The headings of the various sections of this Policy are intended for reference only and shall not be part of the terms and conditions of coverage.

## XXV.  REFERENCES TO LAWS

**(A)** Wherever this Policy mentions any law, including, without limitation, any statute, Act or Code of the U.S., such mention shall be deemed to include all amendments of, and all rules or regulations promulgated under, such law.

**(B)** Wherever this Policy mentions any law or laws, including, without limitation, any statute, Act or Code of the U.S., and such mention is followed by the phrase "or any similar law", such phrase shall be deemed to include all similar laws of all jurisdictions throughout the world, including, without limitation, statutes and any rules or regulations promulgated under such statutes as well as common law.

## XXVI. COVERAGE TERRITORY

Coverage under this Policy applies worldwide.



IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

## TWIN CITY FIRE INSURANCE COMPANY
HOME OFFICE - INDIANAPOLIS, INDIANA
ADMINISTRATIVE OFFICES - HARTFORD, CONNECTICUT
(A STOCK INSURANCE COMPANY MEMBER OF THE HARTFORD)

Lisa Levin, Secretary                                    Douglas Elliot, President

RN 00 N026 00 0593
ILBP 83 01 05 89 RN
83 KB 0336944-19               5/17/19

## PRIVATE CHOICE PREMIER<sup>SM</sup> POLICY

## DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART

### I. INSURING AGREEMENTS

**(A) Insured Person Liability**

The Insurer shall pay **Loss** on behalf of the **Insured Persons** resulting from an **Insured Person Claim** first made against the **Insured Persons** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Persons**, except for **Loss** that an **Insured Entity** pays to or on behalf of the **Insured Persons** as indemnification.

**(B) Corporate Reimbursement**

The Insurer shall pay **Loss** on behalf of an **Insured Entity** that such **Insured Entity** has, to the extent permitted or required by law, indemnified the **Insured Persons** resulting from an **Insured Person Claim** first made against the **Insured Persons** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Persons**.

**(C) Entity Liability (Elective)**

If Entity Liability Coverage is included in ITEM 5 of the Declarations, the Insurer shall pay **Loss** on behalf of an **Insured Entity** resulting from an **Entity Claim** first made against such **Insured Entity** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by an **Insured Entity.**

This Insuring Agreement shall be subject to the Entity Liability Coverage Retention and Prior or Pending Date in ITEM 5 of the Declarations.

**(D) Derivative Demands**

The Insurer shall pay **Investigation Costs** on behalf of an **Insured Entity** that such **Insured Entity** incurs resulting from a **Derivative Demand** first made during the **Policy Period** or Extended Reporting Period, if applicable.

This Insuring Agreement shall be subject to a Sub-limit of Liability of $500,000. Such Sub-limit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sub-limit of Liability shall be part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**. No Retention shall apply to this Insuring Agreement.

### II. DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

- **"Claim"** means any:

  **(1) Insured Person Claim**;

  **(2) Entity Claim**;

  **(3) Derivative Demand.**

- **"Damages"** means the amounts, other than **Defense Costs**, that the **Insureds** are legally liable to pay solely as a result of a **Claim** covered by this **Liability Coverage Part**, including:

  **(1)** compensatory damages;

**(2)** settlement amounts;

**(3)** pre- and post-judgment interest;

**(4)** costs awarded pursuant to judgments;

**(5)** regarding Insuring Agreement (D), **Investigation Costs;**

**(6)** punitive and exemplary damages;

**(7)** the multiple portion of any multiplied damage award; or

**(8)** where permissible by law, and notwithstanding sub-paragraph (a) below, civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-2(g) (2)(B)).

However, **Damages** shall not include:

**(a)** taxes, fines or penalties imposed by law, including, without limitation, **Data Privacy Regulatory Expenses**;

**(b)** non-monetary relief;

**(c)** any other matters uninsurable pursuant to any applicable law; provided, however, that with respect to punitive and exemplary damages, or the multiple portion of any multiplied damage award, the insurability of such damages shall be governed by the internal laws of any applicable jurisdiction that most favors coverage of such damages; or

**(d)** **Notification and Credit Monitoring Expenses**.

**(e)** costs incurred in testing for, abating, monitoring, cleaning-up, removing, containing, treating, detoxing or neutralizing **Pollutants**, nuclear material or nuclear waste.

- **"Data Privacy Event"** means any **Insured Entity's** negligent and improper dissemination of **Nonpublic Personal Information**.
- **"Data Privacy Laws"** means any U.S. federal, state, territorial and local statutes and regulations governing the confidentiality, control and use of **Nonpublic Personal Information** including but not limited to:

**(1)** Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA");

**(2)** Gramm-Leach-Bliley of 1999 ("G-L-B"), also known as the Financial Services Modernization Act of 1999;

**(3)** State privacy protection laws, including but not limited to the California Database Protection Act of 2003 (Cal. SB 1386) and Cal.Civ.Code § 1798.82, that require commercial internet sites or on-line services that collect personal information or medical information (as defined by such laws or acts) to post privacy policies and adopt specific privacy controls or to notify those impacted by identity or data thief, abuse or misuse;

**(4)** Federal and state consumer credit reporting laws, including but not limited to the Federal Fair Credit Reporting Act (FCRA) and the California Consumer Credit Reporting Agencies Act (CCCRAA); or

**(5)** The Fair and Accurate Credit Transaction Act of 2003 (FACTA).

However, **Data Privacy Laws** shall not include any foreign law, regulation or statute.

- **"Data Privacy Regulatory Expenses"** means fines or penalties incurred by an **Insured Entity** and assessed pursuant to a **Data Privacy Laws** in a **Data Privacy Regulatory Proceeding**.
- **"Data Privacy Regulatory Proceeding"** means a civil, formal administrative or formal regulatory proceeding against an **Insured** by a U.S. federal, state or local governmental authority alleging violation of any **Data Privacy Laws.**

- **"Derivative Action"** means any civil proceeding against a **Manager** for a **Wrongful Act** of such **Manager** made on behalf of, or in the name or the right of, an **Insured Entity** by any security holders of such **Insured Entity**, in their capacity as such, if such proceeding is made without the assistance, participation or solicitation of any **Manager.**

- **"Derivative Demand"** means any written demand by any security holders of an **Insured Entity**, in their capacity as such, upon the board of directors or managers of such **Insured Entity** to bring a civil proceeding against a **Manager** for a **Wrongful Act** of such **Manager** if such demand is made without the assistance, participation or solicitation of any **Manager**. A **Derivative Demand** shall be deemed commenced by the receipt of such demand.

- **"Entity Claim"** means any:

  **(1)** written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand;

  **(2)** civil proceeding, including an arbitration or other alternative dispute proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

  **(3)** criminal proceeding commenced by the return of an indictment, or formal administrative or regulatory proceeding commenced by the filing of a notice of charges, or similar document;

  against an **Insured Entity**.

  **Entity Claim** also means a written request to an **Insured Entity** to toll or waive a statute of limitations regarding a potential **Entity Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

- **"Insured Person"** means any:

  **(1)** **Manager**; or

  **(2)** **Employee.**

- **"Insured Person Claim"** means any:

  **(1)** written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand against an **Insured Person**;

  **(2)** civil proceeding, including an arbitration or other alternative dispute proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading against an **Insured Person**;

  **(3)** criminal proceeding commenced by the return of an indictment, or formal administrative or regulatory proceeding commenced by the filing of a notice of charges, or similar document against an **Insured Person**; or

  **(4)** formal civil, criminal, administrative or regulatory investigation of an **Insured Person** in which such **Insured Person** is being investigated pursuant to a Wells Notice, target letter (within the meaning of Title 9, §11.151 of the U.S. Attorney's Manual), subpoena or similar document, as someone against whom a proceeding as set forth above may be brought.

  **Insured Person Claim** also means a written request to an **Insured Person** to toll or waive a statute of limitations regarding a potential **Insured Person Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

  Solely with regard to coverage provided under Insuring Agreement A, "**Insured Person Claim**" also means the service of a subpoena or other similar written request upon an **Insured Person** requiring the **Insured Person** to provide testimony or documents in connection with a covered **Claim**. However, in such situation the Insurer shall pay the **Defense Costs** which are incurred solely by the **Insured Person** who receives such subpoena or written request.

- **"Insured(s)"** means any:

    **(1)** **Insured Entity**; or

    **(2)** **Insured Person**.

- **"Investigation Costs"** means reasonable and necessary expenses incurred in the investigation and evaluation of a **Derivative Demand** by an **Insured Entity**, including its board of directors, board of managers, or any committee thereof, provided that **Investigation Costs** shall not include salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds**.

- **"Legal Services Wrongful Act"** means professional legal services and notarizing services rendered to an **Insured Entity** by an **Insured Person** solely while acting in their capacity as an **Insured Person.**

- **"Nonpublic Personal Information"** means a natural person's first name and last name in combination with any one or more of the following:

    **(1)** social security number;

    **(2)** medical or healthcare information or data;

    **(3)** drivers license number or state identification number; or

    **(4)** financial account information that would permit access to that individual's financial account.

- **"Notice Manager"** means the natural persons in the offices of the chief executive officer, chief financial officer or any equivalent position to the foregoing, of the **Named Entity**.

- **"Notification and Credit Monitoring Expenses"** means the amount of reasonable and necessary expenses incurred by the **Insured Entity**:

    **(1)** to notify its customers or clients of a **Data Privacy Event** to comply with **Notification Laws;**

    **(2)** for credit monitoring services offered by the **Insured Entity** to individuals after a **Data Privacy Event** to comply with **Notification Laws**; or

    **(3)** to provide courtesy notifications to individuals when such notifications are not mandated by **Notification Laws** but are reasonably necessary to preserve the reputation and good name of the **Insured Entity**.

- **"Notification Laws"** means any U.S. statute or regulation that, at the time of a **Data Privacy Event**, requires an **Insured Entity** storing **Nonpublic Personal Information** on a computer system to provide notice to specified individuals of any actual or potential **Data Privacy Event**. However, **Notification Laws** shall not include any foreign law, regulation or statute.

- **"Outside Capacity"** means service by an **Insured Person** as a director, officer, trustee, regent, governor or equivalent executive of an **Outside Entity** with the knowledge and consent of or at the request of an **Insured Entity**.

- **"Outside Entity"** means any:

    **(1)** not-for-profit corporation, community chest, fund or foundation that is exempt from federal income tax as an organization described in Section 501(c)(3), 501(c)(4), 501(c)(7), & 501(c)(10) of the Internal Revenue Code of 1986,

    **(2)** entity organized for a religious or charitable purpose under any not-for-profit statute, or

    **(3)** entity listed as an **Outside Entity** in a written endorsement issued by the Insurer to form a part of this Policy,

    that is not an **Insured Entity**.

- **"Whistleblowing"** means an **Insured Person's** lawful act of providing information, causing information to be provided, or otherwise assisting in an investigation regarding any conduct which the **Insured Person** reasonable believes constitutes a violation of any federal, state or foreign law.

- **"Wrongful Act"** means any actual or alleged:

© 2016, The Hartford

**(1)** error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed by an **Insured Person** in their capacity as such or in their **Outside Capacity,** or, with regard to Insuring Agreement (C) an **Insured Entity**; or

**(2)** matter claimed against an **Insured Person,** solely by reason of their serving in such capacity, including service in an **Outside Capacity.**

**Wrongful Act** also includes a **Legal Services Wrongful Act**, which is only covered if elected on the Declarations.

## III. COVERAGE EXTENSIONS

### (A) OUTSIDE DIRECTORSHIP LIABILITY

Subject to the terms and conditions of this Policy and **Liability Coverage Part**, coverage is afforded for **Loss** resulting from any **Insured Person Claim** against an **Insured Person** for a **Wrongful Act** in an **Outside Capacity**. Such coverage shall be specifically excess of any indemnity and insurance available from or provided by the **Outside Entity**. Payment by the Insurer or any **Affiliate** under any other insurance policy as a result of such **Claim** shall reduce, by the amount of such payment, the Insurer's Limit of Liability available under this Policy for such **Claim**.

### (B) DATA PRIVACY EVENT EXPENSE COVERAGES

If an **Insured Person** first discovers a **Data Privacy Event** during the **Policy Period** and, as conditions precedent, (i) the **Insured Entity** notifies the Insurer in writing of such **Data Privacy Event** within 30 days of such discovery and (ii) at all times endeavors to use its best efforts to mitigate the effect and, if still occurring, duration of such **Data Privacy Event**, then, subject to the Insurer's prior written consent, such consent not to be unreasonably withheld, the Insurer shall reimburse the **Insured Entity** for **Data Privacy Regulatory Expenses** and **Notification and Credit Monitoring Expenses** resulting from such **Data Privacy Event**, subject to the following additional terms and conditions:

**(1)** All **Data Privacy Events** that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies or causes are deemed one **Data Privacy Event** first occurring on the date of the first such dissemination of **Nonpublic Personal Information.**

**(2)** All exclusions applicable to **Loss** under this **Liability Coverage Part**, other than exclusion V.(A)(7), also apply to any **Data Privacy Regulatory Expenses** and **Notification and Credit Monitoring Expenses**.

**(3)** Coverage provided by this extension shall be subject to an aggregate Sub-limit of $50,000. Such Sub-limit shall be the maximum aggregate amount that the Insurer shall pay under this **Liability Coverage Part** for all **Data Privacy Regulatory Expenses** and **Notification and Credit Monitoring Expenses** from all **Data Privacy Events**. Such sub-limit shall be part of, and not in addition to, the Aggregate Limit of Liability applicable to this **Liability Coverage Part.**

**(4)** Coverage provided by this extension shall not be available for any **Data Privacy Event** that an **Insured** discovers during any Extended Reporting Period.

## IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

The Insurer shall not pay **Loss**:

**(A)** for bodily injury, sickness, disease, emotional distress, mental anguish, or death of any person, or damage to or destruction of any tangible property, including loss of use or diminution of value thereof;

Additionally, this exclusion shall not apply to the portion of **Loss** directly resulting from: (i) a civil proceeding brought by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or (ii) a **Derivative Action** or a **Derivative Demand**; or (iii) corporate manslaughter or corporate homicide alleged in a criminal proceeding.

**(B)** in connection with any **Claim** based upon, arising from, or in any way related to any prior or pending written demand, suit or proceeding against any **Insureds** as of the applicable Prior or Pending Date in ITEM 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit or proceeding;

**(C)** in connection with any **Claim** based upon, arising from, or in any way related to any fact, circumstance, situation or **Wrongful Act** that, before the Inception Date in ITEM 3 of the Declarations, was the subject of any notice given under any other directors and officers, management liability, or similar insurance policy of which this coverage part is a direct or indirect renewal or replacement if such notice is accepted under such other policy ;

**(D)** in connection with any **Claim** based upon, arising from, or in any way related to any:

    **(1)** actual or alleged discharge, dispersal, release, or escape of **Pollutants**, or any threat of such discharge, dispersal, release or escape; or

    **(2)** direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**;

provided, however, that this exclusion shall not apply to **Loss** otherwise covered under Insuring Agreement A or to the portion of **Loss** directly resulting from: (i) a civil proceeding brought by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or (ii) a **Derivative Action** or a **Derivative Demand**.

**(E)** in connection with any **Claim** based upon, arising from, or in any way related to any:

    **(1)** claims for unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits or social security benefits;

    **(2)** actual or alleged violation of the Equal Pay Act, Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or any similar law; or

    **(3)** any **Wage and Hour Violation;**

provided, however, that this exclusion shall not apply to the portion of **Loss** directly resulting from: (i) a civil proceeding brought by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or (ii) a **Derivative Action** or a **Derivative Demand.**

**(F)** for any actual or alleged violation of **ERISA** or any similar law;

**(G)** in connection with any **Claim** brought or maintained by or on behalf of any **Insureds** (in any capacity) or any security holder of an **Insured Entity**, provided that this exclusion shall not apply to the portion of **Loss** directly resulting from:

    **(1)** a civil proceeding by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or

    **(2)** a **Derivative Action** or a **Derivative Demand**;

Note: **Whistleblowing** alone shall not be deemed solicitation, assistance or participation for purposes of paragraphs (1) and (2) above.

    **(3)** an **Insured Person Claim** by or on behalf of an **Employee** who is not a past or present **Manager** if such **Claim** is made without the assistance, participation or solicitation of any **Manager**;

    **(4)** an **Insured Person Claim** by or on behalf of a **Manager** for wrongful termination of such **Manager**;

**(5)** a civil proceeding by or on behalf of a former **Manager** who has not served in such capacity for at least one year prior to such **Claim** being made, provided that such **Claim** is made without the assistance, participation or solicitation of any current **Manager** or any former **Manager** who has served in such capacity during the one year prior to such **Claim** being made;

**(6)** a civil proceeding by or on behalf of an **Insured Person** for contribution or indemnification if such **Claim** directly results from a **Claim** that is otherwise covered under this **Liability Coverage Part**;

**(7)** an **Insured Person Claim** brought and maintained in a jurisdiction outside the United States of America, Canada, Australia or any other common law country (including territories thereof) by a **Manager** due to a pleading requirement of such jurisdiction; or

**(8)** a civil proceeding by any bankruptcy trustee, examiner, receiver, liquidator, creditor(s) committee of the **Insured Entity** or rehabilitator (or any assignee thereof) after such bankruptcy trustee, examiner, receiver, liquidator or rehabilitator has been appointed;

**(9)** a civil proceeding as a result of **Whistleblowing**, however, notwithstanding (G)(5) above, this carve back shall not apply if such whistleblower is a **Manager** and the proceeding is brought against the **Insured Entity**;

**(H)** of an **Insured Person** based upon, arising from, or in any way related to such **Insured Person's** service, at any time, as a director, officer, trustee, regent, governor or equivalent executive or as an employee of any entity other than an **Insured Entity** even if such service is at the direction or request of such **Insured Entity,** provided that this exclusion shall not apply to coverage afforded under Section III. of this **Liability Coverage Part** for a **Claim** for a **Wrongful Act** by an **Insured Person** while serving in an **Outside Capacity;**

**(I)** in connection with any **Claim** by or on behalf of any **Outside Entity** upon which an **Insured Person** is serving or has served in an **Outside Capacity**, or any past or present director, officer, trustee, regent, governor or equivalent executive of such **Outside Entity**, provided that this exclusion shall not apply to the portion of **Loss** directly resulting from:

**(1)** a derivative action made on behalf of an **Outside Entity** by any persons who are not:

**(a)** **Insured Persons**; or

**(b)** directors, officers, trustees, regents, governors or equivalent executives of the **Outside Entity**,

and who make such **Claim** without the solicitation, assistance or participation of any such persons; or

**(2)** a civil proceeding brought and maintained by any:

**(a)** **Insured Persons**; or

**(b)** directors, officers, trustees, regents, governors or equivalent executives of an **Outside Entity**,

for contribution or indemnification if such **Claim** directly results from a **Claim** that is otherwise covered under this **Liability Coverage Part**;

**(J)** in connection with any **Claim** based upon, arising from, or in any way related to any public listing or offering of securities of an **Insured Entity** or the purchase or sale of such securities subsequent to such public listing or offering; provided that this exclusion shall not apply to that portion of **Loss** directly resulting from:

**(1)** a **Wrongful Act** in any private placement of an **Insured Entity's** securities exempted from the registration requirements of the Securities Act of 1933, including such securities exempted pursuant to Title III - CROWDFUNDING of the Jumpstart Our Business Startups Act ("JOBS Act");

**(2)** a civil proceeding brought and maintained by any security holders of an **Insured Entity** for the failure of the **Insured Entity** to undertake or complete an initial public offering or sale of securities of such **Insured Entity**; or

**(3)** a **Wrongful Act** relating to the **Insured Entity's** preparation for any public offering, including any presentations made by the **Insured Entity** and its **Managers** via any medium in connection with such offering, if such public offering does not occur.

**(K)** of an **Insured,** based upon, arising from, or in any way related to the gaining of any personal financial profit, remuneration or advantage to which such **Insured** is not legally entitled if a judgment or other non-appealable final adjudication in the underlying action establishes that such a gain did occur; or

**(L)** of an **Insured**, based upon, arising from, or in any way related to any criminal or deliberately fraudulent act or omission or any willful violation of law by such **Insured** if a judgment or other non-appealable final adjudication in the underlying action establishes such an act, omission or violation; provided, however, that this exclusion shall only apply to **Insured Entities** under Insuring Agreement (C), if elected, if a past or present chief executive officer, chief financial officer, general counsel or any position equivalent to the foregoing of the **Named Entity** committed such an act, omission or willful violation.

Regarding exclusions (K) and (L) above: The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured**.

## V.  EXCLUSIONS APPLICABLE TO INSURING AGREEMENT (C)

**(A)** The Insurer shall not pay **Loss** under Insuring Agreement (C) in connection with any **Claim** based upon, arising from, or in any way related to any actual or alleged:

**(1)** liability under any contract or agreement, provided that this exclusion shall not apply to the extent that liability would have been incurred in the absence of such contract or agreement. However, this exclusion shall not apply to the portion of **Loss** directly resulting from: (i) a civil proceeding brought by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or (ii) a **Derivative Action** or a **Derivative Demand**;

**(2)** employment-related **Wrongful Act**;

**(3)** discrimination or sexual harassment;

**(4)** false arrest or imprisonment, abuse of process, malicious prosecution, defamation (including libel and slander), invasion of privacy, trespass, nuisance or wrongful entry or eviction, assault, battery or loss of consortium;

**(5)** infringement, dilution or misappropriation of copyright, patent, trademark, trade name, trade dress, service mark, trade secrets, or other intellectual property; provided, however that this exclusion shall not apply to the portion of **Loss** directly resulting from:

**(a)** a civil proceeding brought and maintained by a security holder(s) of an **Insured Entity,** in their capacity as such; or

**(b)** a **Derivative Action** or a **Derivative Demand**; or

**(6)** unfair trade practices or any violation of the Federal Trade Commission Act or any similar law.

**(B)** The Insurer shall not pay **Loss** under Insuring Agreement C for any **Claim** based upon, arising from, or in any way related to the actual or alleged payment by an **Insured Entity** of inadequate consideration in connection with an **Insured Entity's** purchase of securities issued by any **Insured Entity;** provided, however, that this exclusion shall not apply to the portion of **Loss** representing **Defense Costs** incurred to defend such allegations.

**(C)** The **Insurer** shall not pay **Loss** under Insuring Agreement (C) in connection with any **Claim** based upon, arising from, or in any way related to any actual or alleged:

**(1)** malfunction of any product, or failure of any product to perform in any manner as a result of any deficiency, inadequacy, unfitness, defect or dangerous condition in any product or in its design or manufacture; or

**(2)** rendering of, or failure to render, any services for or on behalf of others for a fee, including, without limitation, services performed by or on behalf of the **Insureds** for or on behalf of a customer or client;

provided, however, that this exclusion shall not apply to the portion of **Loss** directly resulting from: (i) a civil proceeding brought by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or (ii) a **Derivative Action** or a **Derivative Demand.**

## VI. ADDITIONAL LIMIT OF LIABILITY FOR CLAIMS AGAINST MANAGERS

Subject to the terms and conditions of this Policy and **Liability Coverage Part**, an additional Limit of Liability of $1,000,000 shall be available for **Loss** resulting from **Insured Person Claims** against **Managers**, provided that:

**(A)** such **Claims** are covered under Insuring Agreement A; and

**(B)** such additional Limit of Liability shall be excess of all other insurance available to pay **Loss** for such **Claims**, including, without limitation, this Policy, any insurance written specifically as excess over this Policy, and any insurance intended to provide coverage for non-indemnified **Insured Person Claims**, which such insurance must be exhausted prior to this additional Limit of Liability becoming available to pay **Loss**.

The additional Limit of Liability described above shall be the maximum aggregate amount that the Insurer shall pay for all **Loss** from all **Claims** covered under this provision.

## VII. SECURITIES OFFERINGS

If any public offering of an **Insured Entity's** securities occurs during the **Policy Period** that is not exempt from registration under the Securities Act of 1933, the Insurer shall furnish the **Insureds** with a quote for insurance coverage of such offering, provided that:

**(A)** at least 30 days prior to the effective date of such offering, the **Insureds** shall give the Insurer written notice of such offering together with all information requested by the Insurer;

**(B)** such quote shall be on such terms and conditions, including any additional premium, as the Insurer, in its absolute discretion, chooses;

**(C)** any coverage provided shall be on such forms as are in use by the Insurer for public companies at the time of such offering; and

**(D)** if the **Insureds** choose to cancel this Policy to accept a coverage form offered in such quote, unearned premium for this Policy shall be calculated on a pro rata basis.

## VIII. ORDER OF LOSS PAYMENTS

**(A)** If **Loss** is incurred that is acknowledged by the Insurer to be covered under this **Liability Coverage Part,** except that such **Loss** exceeds the remaining available Limit of Liability for this **Liability Coverage Part**, the Insurer shall first pay **Loss** covered under Insuring Agreement A prior to paying **Loss** under any other Insuring Agreements.

**(B)** If **Loss** is incurred that is acknowledged by the Insurer to be covered under any Insuring Agreement other than Insuring Agreement A, the **Named Entity** shall have the right to direct the Insurer to delay payment of such **Loss** until such time as the **Named Entity** specifies. Any such direction by the **Named Entity** to delay or make payment of **Loss** shall be by written notice to the Insurer. Any such delayed payment of **Loss** shall be available to the Insurer to pay **Loss** covered under Insuring Agreement A. Any payment of **Loss** under Insuring Agreement A out of funds withheld by the Insurer pursuant to this provision shall terminate the Insurer's liability to make a delayed payment of **Loss** under any Insuring Agreement other than A by the amount of the payment under Insuring Agreement A. No interest shall be due regarding any delayed payment of **Loss**. Nothing in this provision shall increase the Insurer's Limit of Liability applicable to this **Liability Coverage Part**.

## IX.  RETENTION WAIVER

No Retention shall apply to **Defense Costs** incurred in connection with a **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Retention otherwise applicable to such **Claim**, if a:

**(A)** final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)** complete and final settlement with prejudice;

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

## X.  NOTICE OF CLAIM

**(A)** As a condition precedent to coverage under this **Liability Coverage Part**, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable after a **Notice Manager** becomes aware of such **Claim**, but in no event later than:

    **(1)** if this Policy expires or is otherwise terminated without being renewed with the Insurer, ninety (90) days after the effective date of said expiration or termination; or

    **(2)** the expiration of the Extended Reporting Period, if applicable;

provided, however, that if the Policy is cancelled for non payment of premium, the **Insured** will give the Insurer written notice of such **Claim** prior to the effective date of cancellation.

**(B)** If during the **Policy Period** the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim,** and if written notice of such **Wrongful Act** is given to the Insurer during the **Policy Period**, including the reasons for anticipating such a **Claim**, the nature and date of the **Wrongful Act**, the identity of the **Insureds** allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act**, then any **Claim** subsequently made which arises from such **Wrongful Act** shall be deemed to be a **Claim** first made during the **Policy Period,** and therefore subject to the terms and conditions of this Policy, including, without limitation, Section VII. of the Common Terms and Conditions and the reporting requirements set forth in Section X.(A) above, on the date that the Insurer receives the above notice.

**(C)** If, during the **Policy Period**, the **Insureds** first become aware of a **Wrongful Act** by an **Insured** in connection with a qui tam complaint filed under seal pursuant to Section 3730 of The False Claims Act (31 U.S.C. § 3730) that was first made public during the **Policy Period,** and previously unbeknownst to any **Insured** other than the **Whistleblower** who filed such complaint, then any **Claim** subsequently made that arises therefrom shall be deemed to be a **Claim** first made during this **Policy Period** and therefore subject to the terms and conditions of this Policy, including, without limitation, Section VII. of the Common Terms and Conditions and the reporting requirements set forth in Section X.(A) above; provided, however, that such complaint was not the subject of any notice given under any other insurance policy for which this Policy is a renewal or replacement.

## PRIVATE CHOICE PREMIER℠ POLICY

## EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

### I.  INSURING AGREEMENTS

#### (A) Employment Practices Liability

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for an **Employment Practices Wrongful Act** by the **Insureds**.

#### (B) Third Party Liability (Elective)

If Third Party Liability Coverage is included in ITEM 5 of the Declarations, the Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Third Party Claim** first made against the **Insureds** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Third Party Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to the Third Party Liability Coverage Sub-limit of Liability, Retention, and Prior or Pending Date in ITEM 5 of the Declarations. Such Sub-limit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sub-limit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**.

### II.  DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

- **"Benefits"** means perquisites, fringe benefits, deferred compensation, severance pay and any other form of compensation (other than salaries, wages, or bonuses as a component of a front or back pay award).

- **"Claim"** means any:

  **(1) Employment Practices Claim**; or

  **(2) Third Party Claim**.

- **"Damages"** means the amounts, other than **Defense Costs**, that the **Insureds** are legally liable to pay solely as a result of a **Claim** covered by this **Liability Coverage Part**, including:

  **(1)** compensatory damages, including front pay and back pay award;

  **(2)** settlement amounts;

  **(3)** pre- and post-judgment interest;

  **(4)** costs awarded pursuant to judgments, including any **Training Costs** provided, however, that coverage for **Training Costs** is conditioned upon such **Loss** being subject to the Training Costs Sub-limit specified in ITEM 5 of the Declarations, said Training Costs Sub-Limit being part of, and not in addition to, the Aggregate Limit of Liability for this **Liability Coverage Part**;

  **(5)** punitive and exemplary damages;

  **(6)** the multiple portion of any multiplied damage award; or

  **(7)** liquidated damages under the Age Discrimination in Employment Act, the Family and Medical Leave Act and the Equal Pay Act.

  However, **Damages** shall not include:

**(a)** taxes, fines or penalties imposed by law;

**(b)** non-monetary relief;

**(c) Benefits;**

**(d)** future compensation for any person hired, promoted, or reinstated pursuant to a judgment, settlement, order or other resolution of a **Claim**;

**(e) Stock Benefits**;

**(f)** costs associated with providing any accommodations required by the Americans with Disabilities Act or any similar law; (other than **Training Costs**); or

**(g)** any other matters uninsurable pursuant to any applicable law; provided, however, that with respect to punitive and exemplary damages, or the multiplied portion of any multiplied damage award, the insurability of such damages shall be governed by the internal laws of any applicable jurisdiction that most favors coverage of such damages.

- **"Employee Data Privacy Wrongful Act"** means:

  **(1)** the failure to prevent any unauthorized access to or use of data containing **Private Employment Information** of any **Employee** or applicant for employment with the **Insured Entity** including any such failure that directly results in a violation with respect to the privacy of such **Employee's** or applicant's medical information under the Health Insurance Portability and Accountability Act or credit information under the Fair Credit Reporting Act; or

  **(2)** the failure to notify any **Employee** or applicant for employment with the **Insured Entity** of any actual or potential unauthorized access to or use of **Private Employment Information** of any **Employee** or applicant for employment with the **Insured Entity**, if such notice was required by state or federal regulation or statute.

- **"Employment Practices Claim"** means any of the following if made by or on behalf of an **Employee**, an applicant for employment with an **Insured Entity**, or an **Independent Contractor**:

  **(1)** a written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

  **(2)** a civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading;

  **(3)** a formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the **Insured's** receipt of a notice of charges, formal investigative order or similar document, or by the **Insured's** having evidence of a filing related thereto; or

  **(4)** a criminal proceeding commenced by the return of an indictment or similar document.

  Employment Practices Claim also means:

  **(a)** the receipt of a notice of violation, order to show cause, or a written demand for monetary or injunctive relief that is the result of an audit conducted by the U.S. Office of Federal Contract Compliance Programs.

  **(b)** a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Employment Practices Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

  However, **Employment Practices Claim** shall not include any labor or grievance proceeding or arbitration that is subject to a collective bargaining agreement.

- **"Employment Practices Wrongful Act"** means any:

**(1)** wrongful dismissal, discharge, or termination of employment (including constructive dismissal, discharge, or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;

**(2)** sexual or other workplace harassment, including bullying in the workplace, quid pro quo and hostile work environment;

**(3)** employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, gender identity or expression, genetic makeup, or refusal to submit to genetic makeup testing, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state, or local law, including any such discrimination as a result of disparate treatment;

**(4) Retaliation**;

**(5)** breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising from a personnel manual, employee handbook, or policy statement;

**(6)** employment-related defamation (including libel and slander) or misrepresentation;

**(7)** employment-related violation of the Age Discrimination in Employment Act, the Family and Medical Leave Act and the Equal Pay Act; or

**(8)** violation of the Uniformed Services Employment and Reemployment Rights Act.

**Employment Practices Wrongful Act** also means the following, but only when alleged in addition to or as part of any **Employment Practices Wrongful Act** described above:

**(a)** an employment-related wrongful infliction of mental anguish or emotional distress;

**(b)** the failure to create, provide for or enforce adequate or consistent employment-related policies and procedures;

**(c)** the negligent retention, supervision, hiring or training of **Employees** or **Independent Contractors**;

**(d)** employment-related: false arrest or imprisonment;

**(e)** an employment-related invasion of privacy, including, without limitation, an **Employee Data Privacy Wrongful Act**; or

**(f)** the breach of an **Independent Contractor Agreement.**

- **"Independent Contractor"** means any natural person working in the capacity of an independent contractor pursuant to an **Independent Contractor Agreement.**
- **"Independent Contractor Agreement"** means any express contract or agreement between an **Independent Contractor** and an **Insured Entity** specifying the terms of the **Insured Entity's** engagement of such **Independent Contractor.**
- **"Insured Person"** means any:

**(1) Employee**;

**(2) Manager**; or

**(3) Independent Contractor** but only:

**(a)** while she/he is acting on behalf of an **Insured Entity**; and

**(b)** if and to extent that the **Insured Entity** agrees to indemnify him/her in the same manner as the **Insured Entity's Employees** for liability for **Loss**.

- **"Insureds"** means any **Insured Entity** or **Insured Person.**

- **"Notice Manager"** means the natural persons in the offices of the chief executive officer, chief financial officer, human resources manager or any equivalent position to the foregoing, of an **Insured Entity**.

- **"Private Employment Information"** means any information regarding an **Employee** or applicant for employment with the **Insured Entity**, which is collected or stored by an **Insured** for the purposes of establishing, maintaining or terminating an employment relationship.

- **"Retaliation"** means adverse treatment of an **Employee** or **Independent Contractor** based upon such person:

  **(1)** exercising any rights under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, **ERISA**, or the Americans with Disabilities Act;

  **(2)** refusing to violate any law;

  **(3)** assisting, testifying, or cooperating with a proceeding or investigation regarding alleged violations of law by any **Insured**;

  **(4)** disclosing or threatening to disclose alleged violations of law to a superior or to any governmental agency; or

  **(5)** filing any "whistle blower" claim against any **Insured** under the federal False Claims Act, the Sarbanes-Oxley Act of 2002, or any similar law.

- **"Stock Benefits"** means any offering, plan or agreement between an **Insured Entity** and any **Employee** that grants stock, stock options or stock appreciation rights in the **Insured Entity** to such person, including, without limitation, restricted stock or any other stock grant. **Stock Benefits** shall not include employee stock ownership plans or employee stock purchase plans.

- **"Third Party"** means any natural person who is a customer, vendor, service provider or other business invitee of an **Insured Entity. Third Party** shall not include **Employees**.

- **"Third Party Claim"** means any of the following made by or on behalf of a **Third Party**:

  **(1)** a written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand;

  **(2)** a civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

  **(3)** formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

  **Third Party Claim** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Third Party Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

- **"Third Party Wrongful Act"** means:

  **(1)** discrimination against a **Third Party** based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law; or

  **(2)** sexual harassment or other harassment of a **Third Party**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature.

- **"Training Costs"** means the reasonable costs of training and education for sensitivity, anti-harassment, minority development or diversity programs but only when required under the terms of a settlement, judgment or consent decree; provided, however, that such training and education is commenced and completed within 12 months of the date of said settlement, judgment or consent decree.

- **"Wrongful Act"** means any actual or alleged:

**(1) Employment Practices Wrongful Act**; or

**(2) Third Party Wrongful Act**.

## III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

**(A)** The Insurer shall not pay **Loss**:

**(1)** for bodily injury, sickness, disease, death, false arrest or imprisonment, abuse of process, malicious prosecution, trespass, nuisance or wrongful entry or eviction, or for injury to or destruction of any tangible property including loss of use or diminution of value thereof; provided, however, that this exclusion shall not apply to that portion of **Loss** that directly results from employment-related:

  **(a)** defamation (including libel and slander) or misrepresentation; or

  **(b)** wrongful infliction of mental anguish or emotional distress, false arrest or imprisonment, invasion of privacy (including an **Employee Data Privacy Wrongful Act**) when alleged in connection with an otherwise covered **Employment Practices Wrongful Act**;

**(2)** for any actual or alleged **Wrongful Act** by **Insured Persons** of any **Subsidiary** in their capacities as such, or by any **Subsidiary**, if such **Wrongful Act** actually or allegedly occurred when such entity was not a **Subsidiary**;

**(3)** in connection with any **Claim** based upon, arising from, or in any way related to any:

  **(a)** prior or pending written demand, suit, or proceeding against any **Insured** as of, or

  **(b)** initiated by the U.S. Office of Federal Contract Compliance Programs before

  the applicable Prior or Pending Date in ITEM 5 of the Declarations, or the same or substantially similar fact, circumstance, or situation underlying or alleged in such demand, suit, proceeding, or audit;

**(4)** in connection with any **Claim** based upon, arising from, or in any way related to any fact, circumstance, or situation that, before the inception date in ITEM 3 of the Declarations, was the subject of any notice given under any other employment practices liability policy, management liability policy or other insurance policy which insures **Wrongful Acts** covered under this Policy if such notice is accepted under such policy;

**(5)** in connection with any **Claim** based upon, arising from, or in any way related to the liability of others assumed by an **Insured** under any contract or agreement; provided, however, this exclusion shall not apply to liability that would have attached in the absence of such contract or agreement;

**(6)** for breach of any **Independent Contractor Agreement;** provided, however, that this exclusion will not apply to liability that would have attached in the absence of such contract nor shall it apply to that portion of **Loss** representing **Defense Costs** incurred to defend against such liability; or

**(7)** for a lockout, strike, picket line, hiring of replacement workers or similar action in connection with any labor dispute, labor negotiation or collective bargaining agreement.

**(B)** The Insurer shall not pay **Loss** in connection with any **Claim** based upon, arising from, or in any way related to:

**(1)** any claims for unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, or social security benefits;

**(2)** any actual or alleged violation of the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, **ERISA**, or any similar law; or

**(3)** any **Wage and Hour Violation**

Provided, however, that this exclusion (B) shall not apply to that portion of **Loss** that represents

(a) a specific amount the **Insureds** become legally obligated to pay solely for a **Wrongful Act** of **Retaliation** or discrimination**;** or

(b) **Defense Costs** incurred to defend a **Wage and Hour Violation** referenced in sub-paragraph (3) above subject to the Wage & Hour Defense Costs Sub-Limit of set forth in Item 5 of the Declarations, subject to the following:

  (i) section XI. (B) of the Common Terms and Conditions notwithstanding, 100% of the **Insured's Defense Costs** covered pursuant to this sub-paragraph (b) shall be allocated to covered **Loss** until the Wage & Hour Defense Costs Sub-Limit is exhausted. Once the Wage and Hour Defense Costs Sub-Limit is exhausted, allocation shall continue in accordance with section XI. (B) of the Common Terms and Conditions; and

  (ii) the Wage and Hour Defense Costs Sub-Limit is available notwithstanding the fact that a **Wage and Hour Violation** is not an **Employment Practices Wrongful Act.**

(C) The Insurer shall not pay **Loss** in connection with any **Claim** based upon, arising from, or in any way related to liability incurred for breach of any oral, written, or implied employment contract; provided, however, that this exclusion shall not apply to liability that would have been incurred in the absence of such contract nor shall it apply to the portion of **Loss** representing **Defense Costs** incurred to defend against such liability.

## IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENT (B)

Solely with respect to Insuring Agreement (B), the Insurer shall not pay **Loss** in connection with any **Third Party Claim** based upon, arising from or in any way related to any price discrimination or violation of any anti-trust law or any similar law designed to protect competition or prevent unfair trade practices.

## V. OTHER INSURANCE

(A) The coverage provided under this Policy for any **Employment Practices Claim** shall be primary.

(B) Notwithstanding the above, the coverage provided under this Policy for any **Employment Practices Claim** made against a temporary, leased or loaned **Employee** or an **Independent Contractor** shall be excess of the amount of any deductible, retention and limits of liability under any other policy or policies applicable to such **Claim**, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

## VI. NOTICE OF CLAIM

(A) As a condition precedent to coverage under this **Liability Coverage Part**, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable after a **Notice Manager** becomes aware of such **Claim**, but in no event later than:

  (1) ninety (90) days after the effective date of said expiration or termination if this Policy expires or is otherwise terminated without being renewed with the Insurer; or

  (2) the expiration of the Extended Reporting Period, if applicable;

  provided, however, that if the Policy is cancelled for non payment of premium, the **Insured** will give to the Insurer written notice of such **Claim**, prior to the effective date of cancellation.

(B) However, with regard to any **Employment Practices Claim** which is brought as a formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charge, formal investigative order or similar document, as a condition precedent to coverage under this Policy the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable after a **Notice Manager** becomes aware of such **Claim**, but in no event later than:

**(1)** ninety (90) days after the effective date of said expiration or termination if this Policy expires or is otherwise terminated without being renewed with the Insurer;

**(2)** one hundred eighty (180) days after the renewal date, if this Policy is renewed with the Insurer; or

**(3)** the expiration of the Extended Reporting Period, if applicable;

provided, if this Policy is cancelled for non payment of premium, the **Insured** will give to the Insurer written notice of such **Claim**, prior to the effective date of cancellation.

**(C)** If, during the **Policy Period**, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim**, and, if written notice of such **Wrongful Act** is given to the Insurer during the **Policy Period**, including the reasons for anticipating such a **Claim**, the nature and date of the **Wrongful Act**, the identity of the **Insureds** allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act**, then any **Claim** subsequently made which arises from such **Wrongful Act** shall be deemed to be a **Claim** first made during the **Policy Period,** and therefore subject to the terms and conditions of this Policy, including, without limitation, Section VII. Of the Common Terms and Conditions and the reporting requirements set forth in Section VI.(A) and (B) above, on the date that the Insurer receives the above notice.

## VII.   RETENTION WAIVER

Regarding a **Claim** that is a class action civil proceeding, no Retention shall apply to **Defense Costs** incurred in connection with such **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Retention otherwise applicable to such **Claim**, if a:

**(A)** final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)** complete and final settlement with prejudice;

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss** other than **Defense Costs**.

## VIII.   COORDINATION OF COVERAGE

If this **Liability Coverage Part** and either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part are included under this Policy, and a **Claim** is covered under this **Liability Coverage Part** and any such other **Liability Coverage Part**, **Loss** shall be first covered and paid under this **Liability Coverage Part**.

If notice of a **Claim** has been given under either the Directors, Officers and Entity Liability Coverage Part or Fiduciary Liability Coverage Part and a determination is made by the Insurer that such **Claim** would be covered under this **Liability Coverage Part** if notice had been given under this **Liability Coverage Part**, then the **Insureds** shall be deemed to have given notice of such **Claim** under this **Liability Coverage Part** at the same time that notice was given under such other **Liability Coverage Part**.

# PRIVATE CHOICE PREMIER℠ POLICY

## FIDUCIARY LIABILITY COVERAGE PART

## I.  INSURING AGREEMENTS

### (A)  Fiduciary Liability

The Insurer shall pay **Loss** on behalf of the **Insureds** resulting from a **Fiduciary Claim** first made against the **Insureds**:

  **(1)**  during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds** or by any person for whose **Wrongful Acts** the **Insureds** are legally responsible, subject to sub-paragraph (2) below; or

  **(2)**  during the **Policy Period** that is a **Benefit Denial Appeal** or **Pre-Claim Inquiry**.

### (B)  Settlement Programs (Elective)

If Settlement Program Coverage is included in ITEM 5 of the Declarations, the Insurer shall pay **Settlement Fees** on behalf of the **Insureds** resulting from a **Settlement Program** for which a **Settlement Program Notice** is received by the Insurer during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds.**

This Insuring Agreement shall be subject to the Sub-limit of Liability set forth in the Declarations. Such a Sub-limit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement. Such Sub-limit of Liability shall be subject to, part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**. This Insuring Agreement shall also be subject to the Settlement Program Coverage Retention and Prior or Pending Date in ITEM 5 of the Declarations.

## II.  DEFINITIONS

The following terms, whether used in the singular or plural, shall have the meanings specified below:

- **"Benefit Denial Appeal"** means the appeal of an adverse benefits determination by an **Insured** pursuant to the U. S. Department of Labor's regulation 29 C.F.R. Section 2560.503-1(h) or any similar procedures required by applicable law or regulation.
- **"Claim"** means any **Fiduciary Claim**; or **Settlement Program Notice**.
- **"Damages"** means the amounts, other than **Defense Costs**, that the **Insureds** are legally liable to pay solely as a result of a **Claim** covered by this **Liability Coverage Part**, including:

  **(1)**  compensatory damages;

  **(2)**  settlement amounts;

  **(3)**  pre- and post-judgment interest;

  **(4)**  costs awarded pursuant to judgments;

  **(5)**  punitive and exemplary damages;

  **(6)**  the multiple portion of any multiplied damage award;

  **(7)**  claimant's attorney fees awarded by a court pursuant to Section 502(g) of **ERISA; and**

© 2016, The Hartford
83 KB 0336944-19      5/17/19

**(8)** reasonable fees and expenses of an independent fiduciary retained to review a proposed settlement of a covered **Fiduciary Claim** (including reasonable and necessary fees and expenses of a firm hired by such independent fiduciary to facilitate the review of such a covered **Claim**).

However, **Damages** shall not include:

**(a)** taxes, fines or penalties imposed by law; provided, however, the foregoing shall not apply to:

  **(i)** **Settlement Fees,** provided that Settlement Program Coverage is elected;

  **(ii)** civil penalties of:

- up to 5% imposed upon the **Insureds** pursuant to **ERISA** Section 502(i) or up to 20% imposed pursuant to **ERISA** Section 502(l); or
- up to $50,000 imposed upon the **Insureds,** for the failure to provide required **ERISA** plan documents, pursuant to **ERISA** Section 502(c);

Any such limit shall be a Sub-limit of Liability that shall be part of, and not in addition to, the Aggregate Limit of Liability for this **Liability Coverage Part** shown on the Declarations.

  **(iii)** civil penalties imposed upon the **Insureds** under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Coverage for such civil penalties is conditioned upon such **Loss** being subject to the Sub-limit of Liability specified in ITEM 5 of the Declarations, said sub-limit of liability being part of, and not in addition to, the Aggregate Limit of Liability for this **Liability Coverage Part** shown on the Declarations;

  **(iv)** civil penalties or fines imposed upon the **Insureds**:

- under the Patient Protection and Affordable Care Act, as amended, including any rules or regulations promulgated thereunder. However, this shall not include any amounts imposed on an **Insured** pursuant to section 4980H of the Internal Revenue Code of 1986, as amended; or
- including the up to fifteen percent (15%) tax penalty imposed upon an **Insured** under Sections 4975(a) or 4976(a) of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, directly resulting from a final non-appealable judgment or other final non-appealable adjudication establishing, respectively, that (i) the **Insured** participated inadvertently in a prohibited transaction under 4975(c); or (ii) there has been provided inadvertently a Disqualified Benefit;
- under the English Pension Scheme Act of 1993, the English Pension Act of 1995, or the Pensions Act of 2004 and 2008 (all as amended from time to time) by the Pensions Regulator.; or
- imposed upon an **Insured** for violation of the Pension Protection Act of 2006 ("PPA")

Coverage for such civil penalties stated in subparagraph (iv) is conditioned upon such **Loss** being subject to a sub-limit of liability of $250,000 and said sub-limit of liability being part of, and not in addition to, the Aggregate Limit of Liability for this **Liability Coverage Part** shown on the Declarations;

**(b)** non-monetary relief; and

**(c)** any other matters uninsurable pursuant to any applicable law; provided, however, that with respect to punitive and exemplary damages or the multiple portion of any multiplied damage award, the insurability of such damages shall be governed by the internal laws of any applicable jurisdiction that most favors coverage of such damages.

- **"Employee Stock Ownership Plan"** means any **Insured Plan** that invests more than 10% of its assets in securities of **Insured Entities.**
- **"Fiduciary Claim"** means any:

  **(1)** written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand;

(2) civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading;

(3) criminal proceeding commenced by the return of an indictment; or

(4) formal administrative or regulatory proceeding commenced by the filing or service of a notice of charges, formal investigative order or similar document, including an investigation by the Department of Labor or Pension Benefit Guaranty Corporation. or any governmental authority equivalent that is located outside of the United States (including the Pensions Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or by the United Kingdom Occupational Pensions Regulatory Authority or any successor thereto).

(5) **Pre-Claim Inquiry** or **Benefit Denial Appeal** commenced by written notice;

(6) investigation of an **Insured Person** for a **Wrongful Act** committed in his or her capacity as a fiduciary of an **Insured Plan,** commenced by such **Insured Person's** receipt of a written document identifying him or her as the target of an investigation, including a Wells Notice, target letter or search warrant, but only if received from any governmental authority other than the Department of Labor, Pension Benefit Guaranty Corporation or any governmental authority equivalent thereto that is located outside of the United States (including the Pensions Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or by the United Kingdom Occupational Pensions Regulatory Authority or any successor thereto);

(7) written request upon an **Insured Person** for witness testimony or document production commenced by the service of a subpoena or similar document which compels such testimony or the production of documents in connection with any matter described in sub-paragraphs (1) through (4) above; or

(8) written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Fiduciary Claim** as described in sub-paragraphs (1) through (4) above commenced by the receipt of such request.

**"Fiduciary Claim"** also means a written request to the **Insureds** to toll or waive a statute of limitations regarding a potential **Fiduciary Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

- **"Insured Person"** means any:

  (1) **Manager**;

  (2) **Employee**; or

  (3) natural person who was, is or shall become trustee of an **Insured Plan,** or the member of any committee which oversees the administration or investments of an **Insured Plan,** while in such person's capacity as a trustee or committee member, which shall also include the functional equivalent of a trustee while serving in such a position outside of the U.S.

  **Insured Person** also includes any former **Insured Person** who is serving or has served as an advisor or consultant to an **Insured Plan,** provided that the **Insured Entity** has agreed in writing prior to such service to grant indemnification to said advisor or consultant.

- **"Insured Plan"** means any past, present, or future:

  (1) employee welfare benefit plan or employee pension benefit plan, as defined in **ERISA**, or plans as defined by similar applicable foreign laws and regulations, sponsored solely by an **Insured Entity**, or jointly by an **Insured Entity** and a labor organization, for the benefit of **Insured Persons** only;

  (2) employee benefit plan, including an excess benefit plan, not subject to Title 1 of **ERISA**, sponsored solely by an **Insured Entity** for the benefit of **Insured Persons** only;

  (3) group or group type insurance program, including a Health Savings Account (HSA) program, those that meet the safe harbor conditions set forth in 29.C.F.R. 2510.3-1(j)(1), or any benefit plan that is not subject to Title 1

of ERISA, including any fringe benefit or excess benefit plan, that was, is now or becomes sponsored solely by the **Insured** exclusively for the benefit of an **Insured Person**;

**(4)** government-mandated insurance program for unemployment, social security or disability benefits for **Employees** other than workers compensation; or

**(5)** any other plan, fund, or program specifically included as an **Insured Plan** in a written endorsement issued by the Insurer to form a part of this Policy.

However, an **Insured Plan** shall not include any:

**(a)** **Employee Stock Ownership Plan**; or

**(b)** multi-employer plan.

- **"Insured(s)"** means any:

  **(1)** **Insured Entity;**

  **(2)** **Insured Person**; or

  **(3)** **Insured Plan.**

- **"Managed Care Benefits"** means healthcare benefits provided through a plan which utilizes cost control mechanisms that include but are not limited to preferred provider or similar networks, utilization review and case or disease management services. However, **Managed Care Benefits** do not include healthcare plans which are administered or managed by an **Insured** or any medical services which are or should have been rendered by an **Insured**, or professional services related thereto.

- **"Notice Manager"** means the natural persons in the offices of the chief executive officer, chief financial officer, or any equivalent position to the foregoing, of an **Named Entity**.

- **"Pre-Claim Inquiry"** means a fact finding investigation which does not contain any allegation of a **Wrongful Act**, commenced by the Department of Labor or Pension Benefit Guaranty Corporation or any similar governmental authority located outside of the United States including the Pensions Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or by the United Kingdom Occupational Pensions Regulatory Authority or any successor thereto.

- **"Settlement Fees"** mean any fees, penalties or sanctions imposed by law under a **Settlement Program** that any **Insureds** become legally obligated to pay as a result of a **Wrongful Act**. **Settlement Fees** shall not include costs of corrections, other than fees or penalties.

- **"Settlement Program"** means any voluntary compliance resolution program or similar voluntary settlement program administered by the U.S. Internal Revenue Service, the Department of Labor, the Pension Benefit Guarantee Corporation, or any other governmental body that is entered into by an **Insured Entity**.

- **"Settlement Program Notice"** means a prior written notice to the Insurer by any **Insured Entity** of its intent to enter into a **Settlement Program** that includes a detailed description of the **Wrongful Act** for which notice will be given under the **Settlement Program**.

- **"Wrongful Act"** means any actual or alleged:

  **(1)** error, misstatement, misleading statement, act, omission, neglect or breach of duty constituting a violation of any responsibilities, obligations or duties imposed upon fiduciaries of an **Insured Plan** by **ERISA** or any similar law;

  **(2)** breach of the responsibilities, obligations or duties imposed upon an **Insured** by HIPAA in connection with an **Insured Plan**;

  **(3)** error, misstatement, misleading statement, act, omission, neglect or breach of duty in the selection or oversight of any provider of **Managed Care Benefits** or any similar organization;

**(4)** error, misstatement, misleading statement, act, omission, neglect or breach of duty in counseling, providing interpretations, handling records, or effecting enrollment, termination or cancellation of **Employees**, participants, or beneficiaries under an **Insured Plan**; or in the administration of an **Insured Plan**;

**(5)** act, error or omission by an **Insured** in their settlor capacity with respect to the creation, termination or amendment of an **Insured Plan,** including but not limited to any wellness program or plan which is subject to **ERISA**; or

**(6)** matter claimed against an **Insured** due to such **Insured** acting in the capacity of a fiduciary of an **Insured Plan**.

## III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

**(A)** The Insurer shall not pay **Loss**:

**(1)** for bodily injury, sickness, disease, emotional distress, mental anguish, or death of any person, or damage to or destruction of any tangible property, including loss of use or diminution of value thereof; provided, however, that this exclusion shall not apply to any actual or alleged bodily injury, emotional distress, mental anguish or death of any person resulting from the **Insured's** choice of a provider of **Managed Care Benefits** or by any denial or delay of any benefit under any health care plan (other than a plan which is administered or managed by an **Insured**);

**(2)** in connection with any **Claim** based upon, arising from, or in any way related to any prior or pending written demand, suit or proceeding against any **Insureds** as of the applicable Prior or Pending Date in ITEM 5 of the Declarations or the same or any substantially similar fact, circumstance or situation underlying or alleged in such demand, suit or proceeding;

**(3)** in connection with any **Claim** based upon, arising from, or in any way related to any fact, circumstance or situation that, before the Inception Date in ITEM 3 of the Declarations, was the subject of any notice given under any other fiduciary or management liability insurance policy of which this **Liability Coverage Part** is a direct or indirect renewal or replacement, if such notice is accepted under such other policy;

**(4)** in connection with any **Claim** based upon, arising from, or in any way related to any:

  **(a)** discharge, dispersal, release, or escape of **Pollutants**, or any threat of such discharge, dispersal, release or escape; or

  **(b)** direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**;

  Provided that this exclusion shall not apply to the extent a **Claim** made against any **Insured** alleges a loss to an **Insured Plan** and/or to the accounts of such **Insured Plan's** participants by reason of an occurrence of that which is described in paragraphs 4(a) and (b) above;

**(5)** in connection with any **Claim** based upon, arising from, or in any way related to the liability of others assumed under any contract or agreement, provided that this exclusion shall not apply to liability:

  **(a)** that would have been incurred in the absence of such contract or agreement; or

  **(b)** assumed under any agreement or declaration of trust under which any **Insured Plan** was established;

**(6)** in connection with any **Claim** based upon, arising from, or in any way related to any:

  **(a)** claims for unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, or

  **(b)** actual or alleged violation of the Equal Pay Act, Worker Adjustment and Retraining Notification Act, or any rule or regulation promulgated thereunder, or similar federal, state, local or common laws, rules or regulations;

  **(c)** a **Wage and Hour Violation.**

**(7)** of an **Insured,** based upon, arising from, or in any way related to the gaining of any personal profit, remuneration or financial advantage to which such **Insured** is not legally entitled if a judgment or other non-appealable final adjudication in the underlying action establishes that such a gain did occur; or

**(8)** of an **Insured**, based upon, arising from, or in any way related to any criminal or deliberately fraudulent act or omission or any willful violation of law by such **Insured** if a judgment or other non-appealable final adjudication in the underlying action establishes such an act, omission or violation; provided, however, that this exclusion shall only apply to **Insured Entities** if a past or present chief executive officer, chief financial officer general counsel or any position equivalent to the foregoing of the **Named Entity** committed such an act, omission or willful violation.

Regarding exclusions (7) and (8) above: The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured**.

**(B)** Other than that portion of **Loss** that represents **Defense Costs** incurred to defend the following allegations or demands, the Insurer shall not pay **Loss** for any **Claim**:

**(1)** for the actual or alleged failure to pay benefits pursuant to any **Insured Plan**, provided that this exclusion shall not apply to the extent that:

**(a)** recovery of such benefits is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Insured Person**; or

**(b)** a **Claim** made against any **Insured** alleges a loss to an **Insured Plan** and/or to the accounts of such **Insured Plan's** participants by reason of a change in value of the investments held by such **Insured Plan**, regardless of whether the amounts sought in such **Claim** are characterized by plaintiffs or held by a court to be benefits due or damages for breach of fiduciary duty;

**(2)** based upon, arising from, or in any way related to the actual or alleged failure to fund, or collect contributions owed to, an **Insured Plan**; or

**(3)** for return or reversion of any contributions or assets to an **Insured Entity** from an **Insured Plan**.

## IV.  WAIVER OF RECOURSE

The Insurer shall have no right of recourse against any **Insureds** for any payment of **Loss** made by the Insurer under this **Liability Coverage Part** because of a **Wrongful Act** by such **Insureds** if the premium for this Policy was paid for by other than an **Insured Plan**.

## V.  CHANGES IN EXPOSURE

**(A)** This Section shall supplement, and not replace, Common Terms and Conditions Section XIV. Changes in Exposure.

**(B)** The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (A), Acquisitions or Created Subsidiaries, and (B), Mergers, shall also apply to any employee benefit plan of any newly merged, created or acquired entity and to any trustee of such plan to the extent that such plan and trustee would otherwise qualify as **Insureds** under this Policy. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring before the merger, creation or acquisition of the entity or for any **Interrelated Wrongful Acts** thereto.

**(C)** The provisions of Common Terms and Conditions Section XIV. Changes in Exposure (D) Loss of Subsidiary Status shall also apply to any **Insured Plan** of a former **Subsidiary** and any trustee of such plan. No coverage shall be available for any **Wrongful Act** of such **Insureds** occurring after an entity ceases to be a **Subsidiary**.

## VI.  TERMINATED PLAN COVERAGE

Subject to the terms and conditions of this Policy and **Liability Coverage Part**, coverage shall be afforded for **Loss** resulting from any **Claim** against the **Insureds** for a **Wrongful Act** involving any **Insured Plan** terminated by an **Insured Entity**, including post-termination **Wrongful Acts**.

## VII.  RETENTION WAIVER

No Retention shall apply to **Defense Costs** incurred in connection with a **Claim**, and the Insurer shall reimburse the **Insureds** for any covered **Defense Costs** paid by the **Insureds** within the Retention otherwise applicable to such **Claim**, if a:

**(A)**  final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

**(B)**  complete and final settlement with prejudice,

establishes that none of the **Insureds** in such **Claim** are liable for any **Loss**.

## VIII.  NOTICE OF CLAIM

**(A)**  As a condition precedent to coverage under this **Liability Coverage Part**, the **Insureds** shall give the Insurer written notice of any **Claim** as soon as practicable after a **Notice Manager** becomes aware of such **Claim**, but in no event later than:

    **(1)**  if this Policy expires (or is otherwise terminated) without being renewed with the Insurer, ninety (90) days after the effective date of said expiration or termination; or

    **(2)**  the expiration of the Extended Reporting Period, if applicable

    provided, that if this policy is cancelled for non payment of premium, the **Insured** will give to the Insurer written notice of such **Claim**, prior to the effective date of cancellation.

**(B)**  If, during the **Policy Period**, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim**, and, if written notice of such **Wrongful Act** is given to the Insurer during the **Policy Period**, including the reasons for anticipating such a **Claim**, the nature and date of the **Wrongful Act**, the identity of the **Insureds** allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act**, then any **Claim** subsequently made which arises from such **Wrongful Act** shall be deemed to be a **Claim** first made during the **Policy Period,** and therefore subject to the terms and conditions of this Policy, including, without limitation, Section VII. of the Common Terms and Conditions and the reporting requirements set forth in Section VIII.(A) of this **Liability Coverage Part**, on the date that the Insurer receives the above notice.

## PRIVATE CHOICE PREMIER℠ POLICY

## CRIME COVERAGE PART

**I.  INSURING AGREEMENTS**

Coverage for the **Insureds'** loss or expense is provided under the following Insuring Agreements for which there is a Limit of Insurance shown in the Declarations.

**INSURING AGREEMENT 1. - EMPLOYEE THEFT**

The Insurer will pay for loss of or damage to **Money**, **Securities** and **Other Property** that results directly from **Theft** by an **Employee**, whether or not identifiable, while acting alone or in collusion with other persons.

**INSURING AGREEMENT 2. - FORGERY OR ALTERATION INCLUDING CREDIT CARDS**

**(1)** The Insurer will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money** that are:

  **(a)** made or drawn upon an **Insured**; or

  **(b)** made or drawn by one acting as an **Insured's** agent and drawn on an **Insured's** account or that are purported to have been so made or drawn.

**(2)** The Insurer will also pay for loss resulting directly from **Forgery** or alteration of written instruments required in conjunction with any credit, debit, or charge card issued to an **Insured** or any **Employee** for business use.

**(3)** The Insurer will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

**(4)** The **Insured** must include with its proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss and describing both sides of said instrument.

**INSURING AGREEMENT 3. – INSIDE THE PREMISES -** *Money, Securities and Other Property*

**(1)** The Insurer will pay for loss of **Money** and **Securities** inside the **Premises** or **Banking Premises** resulting directly from **Theft**, disappearance or destruction.

**(2)** The Insurer will pay for loss of or damage to **Other Property:**

  **(a)** inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

  **(b)** inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

**(3)** The Insurer will pay for loss from damage to the **Premises** or its exterior resulting from an actual or attempted:

  **(a)** **Theft** of **Money** or **Securities**; or

  **(b)** **Robbery** or **Safe Burglary** of **Other Property;**

  if an **Insured** is the owner of the **Premises** or is liable for damage to it.

**(4)** The Insurer will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** or unlawful entry into those containers.

**INSURING AGREEMENT 4. – OUTSIDE THE PREMISES -** *Money, Securities and Other Property*

**(1)** The Insurer will pay for loss of **Money** and **Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

© 2016, The Hartford

**(2)** The Insurer will pay for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

## INSURING AGREEMENT 5. - COMPUTER AND FUNDS TRANSFER FRAUD

The Insurer will pay for loss of and loss from damage to **Money**, **Securities** and **Other Property** following and directly related to the use of any computer to fraudulently cause a transfer of that **Money**, **Securities** and **Other Property** from inside the **Premises** or **Banking Premises:**

**(1)** to a person (other than a **Messenger**) outside those **Premises**; or

**(2)** to a place outside those **Premises**.

And, the Insurer will pay for loss of **Money** or **Securities** through **Funds Transfer Fraud** resulting directly from **Fraudulent Transfer Instructions** communicated to a **Financial Institution** and instructing such institution to pay, deliver, or transfer **Money** or **Securities** from an **Insured's Transfer Account**.

## INSURING AGREEMENT 6. - MONEY ORDERS AND COUNTERFEIT CURRENCY

The Insurer will pay for loss resulting directly from an **Insured's** having accepted in good faith and in the regular course of business, in exchange for merchandise, **Money** or services;

**(1)** money orders issued by any post office, express company or bank in any country that are not paid upon presentation; or

**(2)** **Counterfeit** paper currency of any country that is acquired during the regular course of business.

Unless otherwise shown in the Declarations for this **Non-Liability Coverage Part**, the Limit of Insurance under this Insuring Agreement is $50,000. No retention applies to loss covered under this Insuring Agreement unless otherwise shown in the Declarations for this **Non-Liability Coverage Part**.

## INSURING AGREEMENT 7. - COMPUTER SYSTEMS RESTORATION EXPENSES

The Insurer will pay for **Computer Systems Restoration Expense** resulting directly from any loss covered under Insuring Agreement 1 or Insuring Agreement 5 incurred by the **Insured** but only if such covered loss is in excess of the Retention applicable to such covered loss.

## INSURING AGREEMENT 8. – IDENTITY RECOVERY EXPENSES REIMBURSEMENT

The Insurer will provide reimbursement of **Identity Recovery Expenses** incurred by an **Identity Recovery Insured** provided that the **Identity Theft** is first discovered **by the** Identity **Recovery Insured** during the **Policy Period** and is reported to the Insurer as soon as practicable but in no event later than sixty (60) days after it is first discovered by the **Identity Recovery Insured**. With respect to any **Identity Recovery Expenses** that are "legal expenses," coverage shall only be afforded if the **Insured** complies with the following additional terms and conditions: The **Insured** shall immediately notify the Insurer of any claim or suit generating such expenses and shall not make any offer or settle such claim or suit, or incur any related costs or expenses, without the Insurer's prior written authorization, nor shall the **Insured** admit liability in any such claim or suit. The Insurer shall have no duty to defend any such claim or suit, but shall have the right to investigate, negotiate or settle any such claim or suit or to take over the conduct of the defense thereof. Moreover, if, in the Insurer's discretion, the Insurer advances payments for such suit, the Insurer may require a written undertaking, on its terms and conditions, guaranteeing the repayment of any expenses it pays that are determined to be not covered hereunder.

## INSURING AGREEMENT 9. – DECEPTION FRAUD

The Insurer will pay for loss of **Money** or **Securities** resulting from **Deception Fraud.**

## INSURING AGREEMENT 10. – THEFT OF CLIENTS' PROPERTY OFF PREMISES

The Insurer will pay for loss of or damage to **Money**, **Securities** and **Other Property** that is owned or leased by a client for whom the **Insured** performs services on that client's premises, or **Money, Securities** and **Other Property**

that is owned or leased by a customer of such client, and which loss results directly from **Theft** on said client's premises by an identified **Employee**, whether acting alone or in collusion with others.

**INSURING AGREEMENT 11. – INVESTIGATIVE EXPENSES SUBLIMIT**

Provided the amount of covered loss exceeds the applicable insuring agreement's Retention, the Insurer will reimburse the **Insured** for **Investigative Expenses** it incurs per **Occurrence** subject to the Insurer's determination that such **Investigative Expenses** were reasonable and incurred in establishing either the existence or amount of such loss covered under this **Non-Liability Coverage Part**.

Reimbursement as described in this Insuring Agreement (11) is subject to a sublimit that is part of, and not in addition to, the Limit of Insurance for the applicable Insuring Agreement.

## II.  LIMIT OF INSURANCE

The most that the Insurer will pay for loss and expense in any one **Occurrence** is the applicable Limit of Insurance shown in the Declarations.

**Lost Wages** and **Child and Elder Care Expenses** are jointly subject to a sub-limit of $250 per day, not to exceed $5,000 in total per **Occurrence**. This Sub-Limit is part of, and not in addition to, the Insuring Agreement 8 limit of insurance. Coverage is limited to lost wages and expenses incurred within twelve (12) months after the first discovery of the **Identity Theft** by the **Identity Recovery Insured.**

**Mental Health Counseling** is subject to a sub-limit of $1,000 in total per **Occurrence**. This Sub-Limit is part of, and not in addition to, the Insuring Agreement 8 limit of insurance. Coverage is limited to counseling that takes place within 12 months after the first discovery of the **Identity Theft** by the **Identity Recovery Insured.**

In addition to the **Limit of Insurance,** the Insurer shall reimburse the **Insured Entity**, as a result of a covered loss under insuring agreement **Insuring Agreement 2 – Forgery or Alteration Including Credit Cards**, necessary and reasonable legal expenses, incurred and paid by the **Insured Entity**, with the insurer's written prior consent, in any legal proceeding brought against the **Insured Entity** to enforce payment of a forged document or instrument.

Any coverage for loss of **Virtual Currency** under this Policy is subject to a sublimit of $15,000 per **Occurrence**, which sublimit is part of, and not in addition to, any other applicable Limit of Insurance under this Policy.

## III.  RETENTION

The Insurer will not pay for loss or expense in any one **Occurrence** unless the amount of the loss or expense exceeds the Retention Amount shown in the Declarations. The Insurer will then pay the amount of loss or expense in excess of the Retention Amount, up to the Limit of Insurance. In the event that more than one Retention Amount could apply to the same loss or expense, only the highest Retention Amount will be applied.

The foregoing notwithstanding, any coverage for loss of **Virtual Currency** under this Policy is subject to a Retention Amount of $5,000 per **Occurrence**.

## IV.  DEFINITIONS

The following terms, whether used in the singular or plural in this **Non-Liability Coverage Part**, shall have the meaning specified below:

- **"Banking Premises"** means the interior portion of that part of any building occupied by a banking institution or similar safe depository.
- **"Child and Elder Care Expenses"** means actual costs for supervision of children or elderly or infirm relatives or dependents of the **Identity Recovery Insured** during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the **Identity Recovery Insured.**
- **"Computer System"** means a computer and all input, output, processing, storage, off line media library and communication facilities which are connected to such computer, provided that such computer and facilities are:

   **(1)** under the direct operation and control of the **Insured**;

   **(2)** at an **Electronic Data Processor** with whom the **Insured** has contracted for data processing services (including other financial institutions); or

   **(3)** at an automated clearing house (including a Federal Reserve Bank), or other electronic communications system including but not limited to Fedwire, Clearing House Interbank Payment System (CHIPS) and Society for Worldwide International Financial Telecommunications (SWIFT).

- **"Computer Systems Restoration Expenses"** means reasonable and necessary expenses, incurred by the **Insured** with the Insurer's prior written consent, to reproduce or duplicate damaged or destroyed **Data** or computer programs. If such **Data** or computer programs cannot be duplicated from other **Data** or computer programs, then **Computer Systems Restoration Expense** shall also include reasonable costs incurred for computer time, computer programmers or technical experts or consultants to restore such **Data** or computer programs to substantially the same level or operational capability existing immediately before the covered loss. However, **Computer Systems Restoration Expenses** shall not include:

   **(1)** expenses incurred by any entity for which the **Insured Entity** provides or provided goods or services as specified in a written agreement;

   **(2)** **Investigative Expenses;** and

   **(3)** the **Insured's** internal corporate costs, including, without limitation, salaries.

- **"Counterfeit"** means an imitation of an actual valid original that is intended to deceive and to be taken as an original.
- **"Custodian"** means an **Insured**, or any of the **Insureds'** partners, or members or any **Employee** while having the care and custody of **Other Property** inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.
- **"Customer"** means a natural person or entity for whom the **Insured** provides goods or services.
- **"Data"** means a representation of information, knowledge, facts, concepts or instructions which are processed and stored in a **Computer System**.
- **"Deception Fraud"** means the intentional misleading of a person to induce the **Insured** to part with **Money** or **Securities** by someone, other than an identified **Employee**, pretending to be an **Employee,** owner of the **Insured** or one of the following business relations:

   **(1)** A **Vendor**;

   **(2)** A **Customer**;

   **(3)** A **Custodian;** or

   **(4)** A **Messenger.**

- **"Electronic Data Processor"** means a natural person, partnership or corporation authorized by the **Insured** to perform services as a data processor of the **Insured's** checks or other accounting records (not including preparation or modification of computer software or programs). A Federal Reserve Bank or clearinghouse shall not be construed to be an **Electronic Data Processor**.
- **"Employee"** means:

   **(1)** a natural person:

      **(a)** while in any **Insured's** service or for ninety (90) days after termination of such service; and

      **(b)** whom the **Insured** compensates directly by salary, wages, commissions; and

      **(c)** whom the **Insured** has the right to direct and control while performing services for it, including independent contractors;

**(2)** a natural person who is:

    **(a)** a trustee, officer, employee, administrator or manager of any **Employee Benefit Plan(s)** insured under this **Non-Liability Coverage Part**; or

    **(b)** an **Insured's** director or trustee while that person is handling **Money** or **Securities** or **Other Property** of **Employee Benefit Plan(s)** insured under this **Non-Liability Coverage Part**;

**(3)** a natural person who is a director or trustee of an **Insured** while performing acts coming within the scope of the usual duties of an **Employee** or while acting as a member of any of an **Insured's** elected or appointed committees to perform on an **Insured's** behalf, specific as distinguished from general directorial acts;

**(4)** a natural person who is furnished temporarily to an **Insured** by a temporary employment service firm to substitute for a permanent **Employee** as defined in sub-paragraph (1) above, who is on leave, or to meet seasonal or short-term work load conditions and who such **Insured** has the right to direct and control while performing services for such **Insured**;

**(5)** a natural person who is leased to an **Insured** under a written agreement between such **Insured** and a labor leasing firm, to perform duties related to the conduct of such **Insured's** business;

**(6)** a natural person who is a former **Employee**, director, partner, member or trustee of an **Insured** retained as a consultant while performing services for an **Insured**;

**(7)** a natural person who is a non-compensated officer of an **Insured**;

**(8)** a natural person who is a volunteer of an **Insured** who is not compensated, other than one who is a fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee**;

**(9)** a natural person who is a guest student or intern of an **Insured** while pursuing studies or duties with the guidance or direction of such **Insured**; or

**(10)** a natural person who is an **Insured's** partner or limited liability member, but the Insurer will not pay for loss caused by any partner or limited liability member, unless the amount of the loss exceeds the sum of:

    **(a)** any amounts an **Insured** owes that partner or limited liability member; and

    **(b)** the value of that partner's partnership interest, or that limited liability member's ownership interest determined by the closing of the **Insured's** organization's books on the date of discovery of the loss by the **Insured's** organization by anyone not in collusion with the person causing the loss, and

    **(c)** any applicable Retention Amount;

    then the Insurer will pay the amount of loss excess of that sum, up to the Limit of Insurance applicable to Insuring Agreement 1.

However, **Employee** does not mean any agent, broker, factor, commission merchant, consignee, or representative of the same general character, nor does it mean any independent contractor (other than those specified in (1)(c) and (6) above).

- **"Employee Benefit Plan(s)"** means any welfare or pension plan(s) as defined in **ERISA** and which is sponsored by one or more of the **Insureds** and any plan solely sponsored by any **Insured** that is not subject to the terms of **ERISA**.
- **"Financial Institution"** means a bank, savings bank, savings and loan association or similar thrift institution, a stockbroker, mutual fund, liquid assets fund, or similar investment institution in which an **Insured** maintains a **Transfer Account**.
- **"Forgery"** means the signing of the name of another person or organization with intent to deceive; provided, however, that it does not mean a signature that consists in whole or in part of one's own name signed with or without authority, in any capacity, for any reason.
- "**Fraudulent Transfer Instructions**" means:

(1) fraudulent electronic, telegraphic, facsimile, cable, teletype or telephone instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account and which instructions purport to have been authorized by an **Insured** but which have been fraudulently transmitted by another; or

(2) fraudulent written instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account through an electronic funds transfer system at specified times or under specified conditions and which instructions purport to have been duly authorized by an **Insured** but which have been fraudulently issued, forged or altered by another.

- **"Funds Transfer Fraud"** means **Theft** of **Money** or **Securities** from any of the **Insureds' Transfer Accounts** at a **Financial Institution** and occurring through **Fraudulent Transfer Instructions** communicated to such **Financial Institution**.

- **"Identity Recovery Expenses"** means the following when they are reasonable and necessary expenses that are incurred in the United States or Canada as a direct result of an **Identity Theft**:

  (1) costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an **Identity Theft**;

  (2) costs for notarizing affidavits or other similar documents, long distance telephone calls and postage incurred solely as a result of the **Insured's** efforts to report an **Identity Theft** or amend or rectify records as to the **Insured's** true name or identity as a result of an **Identity Theft**;

  (3) costs for up to twelve (12) credit reports from established credit bureaus dated within 12 months after the **Insured's** knowledge or discovery of an **Identity Theft**;

  (4) **Lost Wages**;

  (5) **Child and Elder Care Expenses**;

  (6) **Mental Health Counseling**; and

  (7) legal expenses incurred, with the Insurer's prior written consent, for defending any civil suit brought against an **Identity Recovery Insured** by a creditor or collection agency, or entity acting on behalf of a creditor, for non-payment of goods or services or default on a loan as a result of an **Identity Theft** or for removing any civil judgment wrongfully entered against an **Identity Recovery Insured** as a result of the **Identity Theft**. As used in this sub-paragraph (7), "legal expenses" will also include costs for challenging the accuracy or completeness of any information in a consumer credit report.

- "**Identity Recovery Insured**" means a natural person who is a(n) member of the board of directors, member of the board of trustees, officer, risk manager, in-house general counsel or LLC Member of an Insured Entity.

- "**Identity Theft**" means the fraudulent use of the social security number or other method of identifying an Identity Recovery Insured. This includes fraudulently using the personal identity of an Identity Recovery Insured to establish credit accounts, secure loans, enter into contracts or commit crimes. However, Identity Theft does not include the fraudulent use of a business name, d/b/a or other method of identifying a business activity.

- **"Insured(s)"** shall mean any **Insured Entity** or, solely under Insuring Agreement 8, an **Identity Recovery Insured**.

- **"Investigative Expenses"** means reasonable and necessary expenses incurred and paid by an **Insured** with the prior written consent of the Insurer in establishing the existence and amount of any direct loss covered under Insuring Agreements 1 through 6 within this **Non-Liability Coverage Part**. The reasonableness of such expenses shall be determined by the Insurer and shall not include any **Insured's** internal corporate obligations such as **Employee** wages or any other internal costs.

- **"Lost Wages"** means actual lost wages of the **Identity Recovery Insured** for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. "Actual lost wages" may include payment for vacation days, discretionary days, floating holidays and paid personal days but does not include payment for sick days or any loss arising from time taken away from self employment. "Time

reasonably and necessarily taken away from work" does not include time off to do tasks that could reasonably have been done during non-working hours.

- **"Mental Health Counseling"** means actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the **Identity Recovery Insured**.

- **"Messenger"** means an **Insured**, any of the **Insured's** partners or members or any **Employee** while having care and custody of **Money, Securities** and **Other Property** outside the **Premises**.

- **"Money"** means currency, **Virtual Currency**, coins and bank notes in current use and having a face value; and traveler's checks, register checks and money orders held for sale to the general public.

- **"Occurrence"** means:

  **(1)** as respects Insuring Agreement 1, all loss caused by, or involving, one or more **Employees**, whether the result of a single act or a series of acts;

  **(2)** as respects Insuring Agreement 2, all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments;

  **(3)** as respects Insuring Agreement 8, all acts incidental to an **Identity Theft,** any series of **Identity Thefts** and all **Identity Thefts** arising from the same method of operation, whether committed by one or more persons, shall be deemed to arise out of one act and shall be treated as one **Identity Theft**. If an act causes a covered expense under Insuring Agreement 8 to more than one **Identity Recovery Insured,** the limit of insurance and Retention Amount for Insuring Agreement 8. set forth on the Declaration page shall be the most the Insurer shall pay for all covered loss in the aggregate; or

  **(4)** as respects all other Insuring Agreements, an act or series of related acts involving one or more persons; or an act or event or a series of related acts or events not involving any person.

- **"Other Property"** means any tangible property other than **Money** or **Securities** that has intrinsic value but does not include any property excluded under this **Non-Liability Coverage Part**. **Other Property** does not include trade secrets, proprietary information, confidential information or any copyrights, patents, trademarks, proprietary manufacturing or processing procedures, or secret or confidential information, including but not limited to credit card numbers, bank account numbers or any similar information.

- **"Premises"** means the interior of that portion of any building that an **Insured** occupies in conducting its business.

- **"Robbery"** means the unlawful taking of **Other Property** from the care and custody of a person, by one who has caused or threatened to cause that person bodily harm or committed an obviously unlawful act witnessed by that person, to the deprivation of an **Insured**.

- **"Safe Burglary"** means the unlawful taking of **Other Property** from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior or the taking of a safe or vault from inside the **Premises**.

- **"Securities"** means negotiable or non-negotiable instruments or contracts representing either **Money** or **Other Property** and includes tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use and evidences of debt issued in connection with credit or charge cards, which cards are not issued by an **Insured**. However, **Securities** do not include **Money**.

- **"Theft"** means the unlawful taking of **Money**, **Securities** or **Other Property** to the deprivation of an **Insured**.

- "**Transfer Account**" means an account maintained by an **Insured** at a **Financial Institution** from which the **Insured** or its authorized representative may cause the payment, transfer or delivery of **Money** or **Securities** by any means described in the **Fraudulent Transfer Instructions** definition.

- "**Vendor**" means a business entity that sells goods or services to the **Insured**.

- "**Virtual Currency**" means a virtual or digital representation of value that is not issued by a central bank or a public authority, but may be accepted as a means of payment and can be transferred, stored or traded electronically, whether or not it is recognized as, or exchangeable for, legal tender.

- "**Watchperson**" means any person whom an **Insured** retains specifically to have the care and custody of **Other Property** inside the **Premises** and who has no other duties.

**V.  EXCLUSIONS** *(Applying To All Insuring Agreements Unless Otherwise Specified)*

**This Coverage Part Does Not Apply To And The Insurer Will Not Pay For:**

**(A) Accounting or Arithmetical Errors or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**(B) Acts Committed By The Insured's Partners or Limited Liability Members**

Loss resulting from **Theft, Deception Fraud** or **Forgery** committed by any partner or limited liability member of an **Insured** whether acting alone or in collusion with others; provided that, this exclusion will not apply to **Theft**, if otherwise covered under Insuring Agreement 1, or **Forgery**, if otherwise covered under Insuring Agreement 2, subject to the same calculation of coverage set forth in paragraph (10) of the definition of **Employee**.

**(C) Acts of Employees, Managers, Directors, Trustees or Representatives**

Loss resulting from **Theft**, **Deception Fraud** or any other dishonest or criminal act committed by any of the **Insureds' Employees**, managers, directors, trustees or representatives whether acting alone or in collusion with other persons or while performing services for any **Insured** or otherwise, except when covered under Insuring Agreement 1.

**(D) Employee Cancelled Under Prior Insurance**

Loss caused by any **Insured's Employees** or by any **Employee** of any **Insured's** predecessor in interest, for whom similar prior insurance has been cancelled and not reinstated since the last cancellation.

**(E) Exchanges or Purchases**

Loss resulting from the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase. This exclusion shall not apply to the Deception Fraud insuring Agreement.

**(F) Fire**

Loss from damage to the premises resulting from fire, however caused, except for loss of or damage to **Money** or **Securities** and loss from damage to a safe or vault under Insuring Agreement 3.

**(G) Governmental Action**

Loss resulting from seizure or destruction of **Money**, **Securities** or **Other Property** by order of governmental authority.

**(H) Indirect Loss**

Loss that is an indirect result of any act or **Occurrence** covered by this **Non-Liability Coverage Part** including but not limited to loss resulting from:

**(1)** any **Insured's** inability to realize income that it would have realized had there been no loss of or damage to **Money**, **Securities** or **Other Property**.

**(2)** payment of damages of any type for which any **Insured** is legally liable; provided, however, that the Insurer will pay compensatory damages arising directly from a loss covered under this **Non-Liability Coverage Part**.

**(3)** Except as set forth in INSURING AGREEMENT 11, payment of costs, fees or other expenses any **Insured** incurs in establishing either the existence of or the amount of loss under this **Non-Liability Coverage Part.**

**(I) Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon any computation or comparison that involves in any manner a profit and loss computation or an inventory computation.

However, where the **Insured** establishes wholly apart from such inventory computations that it has sustained a loss covered under this **Non-Liability Coverage Part**, then the **Insured** may offer its inventory records and actual physical count of inventory in support of the amount of loss claimed.

**(J) Legal Expenses**

Expenses related to any legal action; provided however that this shall not apply to expenses covered under Insuring Agreements 2 or 8.

**(K) Money Operated Devices**

Loss of **Money** contained in any money operated device unless a continuous recording instrument in the device records the amount of any **Money** deposited in it.

**(L) Motor Vehicles or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers, or semi-trailers or equipment or accessories attached to them. This exclusion shall apply only to Insuring Agreement 4.

**(M) Nuclear**

Loss resulting directly or indirectly from:

**(1)** discharge, dispersal, release or escape of nuclear material, nuclear waste or radiation or any threat of such discharge, dispersal, release or escape; or

**(2)** direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize nuclear material, nuclear waste or radiation.

**(N) Risks Inherent in Insurance Operations**

Loss resulting directly or indirectly from contractual or extra contractual liability sustained by any **Insured** in connection with the issuance of contracts or purported contracts of insurance, indemnity or suretyship.

**(O) Trading Losses**

Loss resulting directly or indirectly from any authorized or unauthorized trading of **Money**, **Securities** or **Other Property**, whether in any **Insured's** name or in a genuine or fictitious account.

**(P) Transfer or Surrender of Property**

Loss of or damage to **Money**, **Securities** or **Other Property** after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**

**(1)** on the basis of unauthorized instructions, unless covered under Insuring Agreement 5; or

**(2)** as a result of a threat to do bodily harm to any person; or

**(3)** as a result of a threat to do damage to any **Money**, **Securities** and **Other Property**.

But this Exclusion does not apply under Insuring Agreement 4 to loss of **Money**, **Securities** and **Other Property** while outside the **Premises** or **Banking Premises** in the care and custody of a **Messenger** if the **Insured**:

**(a)** had no knowledge of any threat at the time that the conveyance began; or

**(b)** had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**(Q) Vandalism**

Loss resulting from damages to the **Premises** or to the exterior of any safe, vault, cash box, cash drawer or cash register by vandalism or mischief.

**(R) Voluntary Parting of Title To or Possession of Property**

Loss resulting from any **Insured**, or anyone acting on its express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any **Money**, **Securities** and **Other Property**. This exclusion shall apply only to Insuring Agreements 3 and 4.

**(S) War and Similar Actions**

Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion, or revolution, or any related act or incident.

**(T) Deception Fraud Exclusions**

**(1)** Loss or damage resulting directly or indirectly from **Deception Fraud.** This exclusion shall not apply to the Deception Fraud Insuring Agreement.

**(2)** Loss or damage:

  **(a)** resulting from **Theft** by an **Employee;**

  **(b)** resulting from **Forgery** or alteration of:

  **(i)** checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money**; or

  **(ii)** written instruments required in conjunction with any credit, debit or charge card;

  **(c)** directly related to the use of any computer to fraudulently cause a transfer of **Money** or **Securities** from inside the **Premises** or **Banking Premises;**

  **(d)** resulting from **Funds Transfer Fraud;**

  **(e)** resulting from the **Insureds** having accepted in good faith and in the regular course of business, in exchange for merchandise, **Money** or services:

  **(i)** money orders issued by any post office, express company or bank in any country that are not paid upon presentation; or

  **(ii)** **Counterfeit** paper currency of any country;

  **(f)** resulting from any investments in **Securities** or ownership in any corporation, partnership, real property, or similar instrument, whether or not such investment is genuine;

  **(g)** resulting from the failure, malfunction, inadequacy or illegitimacy of any product or service, including in the advertisement or labelling thereof;

  **(h)** resulting from the failure of any party to perform, in whole or in part, under a contract;

  **(i)** resulting from gambling, game of chance, lottery or similar game; and

  **(j)** resulting from any party's use or acceptance of any credit card, debit or similar instrument, whether or not genuine.

  This exclusion shall apply only to the Deception Fraud Insuring Agreement.

**(3)** Loss of or damage to **Other Property.** This exclusion shall apply only to the Deception Fraud Insuring Agreement.

© 2016, The Hartford

**(4)** Loss of **Money** or **Securities**:

    **(a)** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company; or

    **(b)** inside the **Premises** or **Banking Premises** resulting directly from disappearance or destruction.

This exclusion shall apply only to the Deception Fraud Insuring Agreement.

**(U) Noncompliance With Credit, Debit, Or Charge Card Issuer's Requirements**

Loss resulting directly or indirectly from any credit, debit or charge card if the **Insured** has not complied fully with the provisions, conditions or other terms under which the card was issued. This exclusion shall apply only to Insuring Agreement 2.

**(V) Intellectual Property, Confidential Information And Electronic Data**

Loss resulting directly or indirectly from any **Theft**, disappearance, damage, destruction or disclosure of any intangible property including:

**(1)** trade secrets, proprietary information, confidential information or any copyrights, patents, trademarks, proprietary manufacturing or processing procedures;

**(2)** other secret or confidential information, including but not limited to credit card numbers, bank account numbers or any similar information, unless covered under Insuring Agreement 8; or

**(3) Data** unless covered under Insuring Agreement 7.

**(W) Identity Recovery Insured – Fraud, Dishonest or Criminal Acts**

Loss resulting from any fraudulent, dishonest or criminal act by an **Identity Recovery Insured** or any person aiding or abetting an **Identity Recovery Insured**, or by any authorized representative of an **Identity Recovery Insured**, whether acting alone or in collusion with others. However, this exclusion shall not apply to the interests of an **Insured** who has no knowledge of or involvement in such fraud, dishonesty or criminal act.

**(X) Professional or Business Identity Theft**

Loss resulting from **Theft** of any professional or business identity.

## VI. GENERAL CONDITIONS

**(A) ARMORED MOTOR VEHICLE COMPANIES**

Under Insuring Agreement 4. the Insurer will pay only for the amount of loss the **Insured** cannot recover:

**(1)** under its contract with the armored motor vehicle company; and

**(2)** from any insurance or indemnity carried by or for the benefit of customers of the armored motor vehicle company, or from the armored motor vehicle company.

**(B) CANCELLATION AS TO ANY EMPLOYEE**

Insuring Agreement 1. is cancelled as to any **Employee**:

**(1)** immediately upon discovery by a member of the Risk Management Department or any officer, manager, or supervisor of an **Insured** not in collusion with the **Employee** of **Theft** or any dishonest act in excess of $25,000 committed by the **Employee** whether before or after becoming employed by the **Insured**; or

**(2)** on the date specified in a notice mailed to an **Insured**. The date will be at least thirty (30) days after the date of the mailing. The mailing of notice to the **Insured** at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

## (C) RECOVERIES

**(1)** Any recoveries made before the resolution of all or any part of a claim under this policy shall be distributed/ applied in the following order of priority:

    **(a)** to the party (either the **Insured** or Insurer) to reimburse it for the reasonable and necessary costs of obtaining the recovery; and then

    **(b)** to the **Insured** to reduce the amount of covered loss.

**(2)** Any recoveries made after the resolution of all or any part of a claim under this policy shall be distributed/applied in the following order of priority:

    **(a)** to reimburse the party (either the **Insured** or Insurer) for the reasonable and necessary costs of obtaining the recovery; and then

    **(b)** to the **Insured**, until reimbursed for any excess covered loss sustained that exceeds the Limit of Insurance and the Retention Amount, if any; and then

    **(c)** to the Insurer, until reimbursed for the amount paid; and then

    **(d)** to the **Insured**, until reimbursed for that part of the loss equal to the Retention Amount, if any; and then

    **(e)** to the **Insured** for any loss not covered.

**(3)** Recoveries do not include any recovery:

    **(a)** from insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

    **(b)** of original securities after duplicates of them have been issued.

## (D) CHANGES IN EXPOSURE

**(1) Mergers**

If, before or during the **Policy Period**, any **Insured Entity** merges with another entity such that the **Insured Entity** is the surviving entity, then such merged entity and its subsidiaries shall be **Insureds** to the extent such entities would otherwise qualify as **Insureds** under this **Non-Liability Coverage Part**. Coverage provided hereunder shall only apply to covered loss occurring after the effective date of such merger. No coverage shall be available under this **Non-Liability Coverage Part** for loss occurring before such merger.

However, if the fair value of the assets of any newly merged entity exceed 35% of the total assets of the **Named Entity** as reflected in its most recent consolidated financial statements prior to such merger, then, the **Insureds** shall give the Insurer written notice and full, written details of the merger as soon as practicable:

    **(a)** prior to the expiration or termination date of this Policy, or

    **(b)** within ninety (90) days of such merger;

whichever date is later.

There shall be no coverage under any renewal or replacement of this Policy, for any newly merged entity or any of its subsidiaries unless the **Insureds** comply with the terms of this provision.

**(2) New Subsidiaries**

If, before or during the **Policy Period**, any **Insured Entity** acquires or creates a **Subsidiary,** then such acquired or created entity and its subsidiaries shall be **Insureds** to the extent such entities would otherwise qualify as **Insureds** under the **Non-Liability Coverage Part.** Coverage provided hereunder shall only apply to covered loss occurring after the effective date of such acquisition or creation. No coverage shall be available for loss occurring before such acquisition or creation.

However, if the fair value of the assets of any newly acquired or created entity exceed 35% of the total assets of the **Named Entity** as reflected in its most recent consolidated financial statements prior to such acquisition or creation the **Insureds** shall give the Insurer written notice and full, written details of the acquisition or creation as soon as practicable:

**(a)** prior to the expiration or termination date of this Policy, or

**(b)** within ninety (90) days of such merger;

whichever date is later.

There shall be no coverage under the renewal or replacement of this Policy, for any such new **Subsidiary** unless the **Insureds** comply with the terms of this provision.

**(3) Takeover of Named Entity**

If, before or during the **Policy Period**:

**(a)** the **Named Entity** merges into or consolidates with another entity such that the **Named Entity** is not the surviving entity; or

**(b)** all, or substantially all of the assets of the **Named Entity** are acquired by another person or entity, group of persons or entities, or persons and entities acting in concert such that the **Named Entity** is not the surviving entity; or

**(c)** more than 50% of the securities representing the right to vote for the **Named Entity's** board of directors or managers is acquired by another person or entity, group of persons or entities, or persons and entities acting in concert;

then coverage under this **Non-Liability Coverage Part** shall immediately terminate as of the date of such transaction and any incident occurring upon or after such date shall not be covered hereunder.

**(4) Loss of Subsidiary Status**

If, before or during the **Policy Period**, any entity ceases to be a **Subsidiary**, then coverage under this **Non-Liability Coverage Part** shall immediately terminate as of the date of such transaction and any incident occurring upon or after such date shall not be covered hereunder.

**(E) DISCOVERY**

**(1)** The Insurer will pay for loss which an **Insured** sustains through acts or events committed or occurring at any time and which are discovered by the **Insured** during the **Policy Period** or during the period provided in General Condition G. DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS.

**(2)** Discovery of loss occurs when a member of the Risk Management Department, the Chief Executive Officer, or Chief Financial Officer, or equivalent officer of the **Named Insured** first becomes aware of facts which would cause a reasonable person to assume that a loss covered by this **Non-Liability Coverage Part** has been, or may be incurred even though the exact amount or details of the loss may not then be known.

**(3)** Discovery also occurs when an **Insured** receives notice of an actual or potential claim against it alleging facts, which if true, would constitute a covered loss under this policy.

**(4)** No coverage will be available under this **Non-Liability Coverage Part** for any loss of which an **Insured** was aware prior to the inception date of this **Non-Liability Coverage Part**.

**(5)** If an **Identity Theft** is first discovered in one **Policy Period** and continues into other policy periods, all loss and expense arising from such **Identity Theft** will be subject to the aggregate limit applicable to the policy period when the **Identity Theft** was first discovered.

## (F) DISCOVERY SUPERSEDING LOSS SUSTAINED COVERAGE – LIABILITY FOR PRIOR LOSSES

**(1)** If this **Non-Liability Coverage Part** has replaced similar prior insurance written by a company other than the Insurer, and such other insurance provided a period of time to discover loss occurring prior to the termination or cancellation of that coverage, and a loss is discovered within the period provided by prior insurance to discover losses, the Insurer will not pay for such loss unless the amount exceeds the Limit of Insurance under said prior Policy. The Insurer will then only pay the **Insured** for any excess loss subject to the terms and conditions of this **Non-Liability Coverage Part**.

**(2)** Any payment that the Insurer makes to an **Insured** under this insurance shall not exceed the difference between the amount of insurance under the **Insured's** prior Policy and the Limit of Insurance shown in the Declarations and the Insurer will not apply its Retention Amount to any excess loss payment.

## (G) DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS

The Insurer will pay for loss that an **Insured** sustained prior to the effective date of termination or cancellation of this **Non-Liability Coverage Part**, which is discovered by the **Insured**:

**(1)** no later than ninety (90) days from the date of the termination, cancellation or non-renewal; and

**(2)** as respects any **Employee Benefit Plan(s)**, no later than one (1) year from the date of that termination, cancellation or non-renewal.

However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** to replace, in whole or in part, the insurance afforded by this **Non-Liability Coverage Part**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

## (H) DUTIES IN THE EVENT OF LOSS

After a member of the Risk Management Department or an officer, manager or supervisor of an **Insured's** discovers a loss or a situation which may result in a loss of or damage to **Money**, **Securities** or **Other Property**, the Risk Management Department member or officer, manager or supervisor must:

**(1)** notify the Insurer as soon as possible but no later than one hundred eighty (180) days after discovery of loss;

**(2)** submit to an examination under oath at the Insurer's request and give it a signed statement;

**(3)** give the Insurer a detailed, sworn proof of loss within one hundred eighty (180) days after discovery of loss;

**(4)** cooperate with the Insurer in the investigation and settlement of any claim;

**(5)** with respect to Insuring Agreements 3 and 4, notify the police if an **Insured** has reason to believe that its loss involves a violation of the law; and

**(6)** with respect to Insuring Agreement 8, the **Identity Recovery Insured** must send to the Insurer, within sixty (60) days after its notification that comports with sub-paragraph (H)(1) above, receipts, bills or other records that support the **Insured's** claim for **Identity Recovery Expenses.**

## (I) EMPLOYEE BENEFIT PLANS PROVISION

**(1)** In compliance with certain provisions of **ERISA**:

**(a)** The Insurer will pay for loss of or damage to **Money**, **Securities** or **Other Property** of any **Employee Benefit Plan(s)** sponsored exclusively by the **Insured** resulting directly from fraudulent or dishonest acts by an **Employee**.

**(b)** **Subject to (I)(1)(c)** below, in no event shall coverage for any **Employee Benefit Plan(s)** be more than the Limit of Insurance shown on the **CRIME COVERAGE PART** Declarations under ITEM 1 Insuring Agreement 1. Such limit shall be part of and not in addition to the Limit of Insurance for Insuring Agreement 1 stated on the Declarations.

**(c)** However, with respect to **Employee Benefit Plan(s)** subject to **ERISA,** if at the inception of this Policy the **Insured** has a limit of insurance for such insured **Employee Benefit Plan(s)** that is equal to or greater than the limit required under **ERISA**, the Insurer agrees to, as the need arises, automatically increase the limit of insurance to equal the amount required under **ERISA,** at the time the **Insured** discovers a **Loss**. In no event, shall said limit exceed $500,000 for an **Employee Benefit Plan** which does not hold employer securities and $1,000,000 for an **Employee Benefit Plan** which does hold employer securities.

**(2)** Any payments the Insurer makes to an **Insured** for loss sustained by any **Employee Benefit Plan** will be held by that **Insured** for the use and benefit of the **Employee Benefit Plan** sustaining the loss.

**(3)** If two or more **Employee Benefit Plans** are insured under this **Non-Liability Coverage Part**, any payment which the Insurer makes for loss sustained by two or more **Employee Benefit Plans**, or of commingled funds or **Other Property** of two or more **Employee Benefit Plans**, which arises out of one **Occurrence**, is to be shared by each **Employee Benefit Plan** sustaining loss in the proportion that the Limit of Insurance required for each **Employee Benefit Plan** bears to the total of those limits.

**(4)** The Retention Amount which applies to Insuring Agreement 1 shall not apply to loss sustained by any **Employee Benefit Plans** subject to **ERISA** and which plan is covered under this insurance.

**(J) JOINT INSURED**

**(1)** The **Named Entity** will act for itself and for every other **Insured** for all purposes of this **Non-Liability Coverage Part**.

**(2)** If any **Insured**, partner, member or officer of an **Insured** has knowledge of any information relevant to this **Non-Liability Coverage Part**, that knowledge is considered to be knowledge of every **Insured**.

**(3)** An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

**(4)** If this **Non-Liability Coverage Part** or any of its Insuring Agreements is cancelled, terminated or non-renewed as to any **Insured**, loss sustained by that **Insured** is covered only if discovered by the **Insured** during the period of time provided in General Condition G. DISCOVERY – EXTENDED PERIOD TO DISCOVER LOSS. This extended period to discover loss also terminates in accordance with paragraph 2 of that condition.

**(5)** The Insurer will not pay a greater amount for loss sustained by more than one **Insured** than the Insurer would pay if all of the loss had been sustained by one **Insured**.

**(K) OWNERSHIP OF PROPERTY; INTERESTS COVERED**

**(1)** The property covered under this **Non-Liability Coverage Part** is limited to **Money, Securities** or **Other Property:**

**(a)** that an **Insured** owns or leases; or

**(b)** owned by an **Insured's** client and which the **Insured** holds on its **Premises** or which is in the custody of one acting as the **Insured's Messenger** and while such **Money**, **Securities** or **Other Property** is in transit; or

**(c)** for which an **Insured** is legally liable or which is covered under Insuring Agreement 10.

**(2)** However, this **Non-Liability Coverage Part** is for the **Insureds'** benefit alone and no other person or organization has any rights or benefits. Any claim for a loss of client **Money, Securities** or **Other Property** occurring on an

**Insured's Premises** or while in transit in the custody of a **Messenger** may only be made by an **Insured** in its proof of loss.

**(L) VALUATION**

**(1)** Subject to the applicable Limit of Insurance, the Insurer will pay for:

    **(a)** loss of **Money** but only up to and including its face value. The Insurer may, at its option, pay for a loss of **Money** issued by any country other than the U.S. in either the face value in the **Money** issued in that country, or, in the U.S. dollar equivalent determined by the rate of exchange as stated in the *Wall Street Journal* on the day that the loss occurred.

    **(b)** loss of **Securities** but only up to and including their value as stated in the *Wall Street Journal* at the close of business on the day that the loss was discovered. However, the Insurer may, at its option, 1) pay the value of such **Securities**, 2) replace them in kind in which event an **Insured** must assign to the Insurer all its rights, title and interest in and to those **Securities** or 3) pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the Insurer will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of

        **(i)** the value of the **Securities** as stated in the *Wall Street Journal* at the close of the business on the day the loss was discovered; or

        **(ii)** the Limit of Insurance.

    **(c)** loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the **Other Property** without deduction for depreciation, subject to (2) below. However, the Insurer will not pay for more than the lesser of:

        **(i)** the Limit of Insurance applicable to the lost or damaged **Other Property**; or

        **(ii)** the cost to replace the lost or damaged **Other Property** with **Other Property** of comparable material and quality and used for the same purpose; or

        **(iii)** the amount that any **Insured** actually spends that is necessary to repair or replace the lost or damaged **Other Property**.

**(2)** The Insurer will not pay on a replacement cost basis for any loss or damage:

    **(a)** until the lost or damaged **Other Property** is actually repaired or replaced; and

    **(b)** unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

    If the lost or damaged **Other Property** is not repaired or replaced, the Insurer will pay based on actual cash value.

**(3)** The Insurer may, at its option, pay for loss of or damage to **Other Property** or **Securities** in the **Money** of the country in which the loss occurred or in the United States of America dollar equivalent of the **Money** of the country where the loss occurred determined by the rate of exchange on the day the loss was discovered. Any **Other Property** that the Insurer pays for or replaces becomes its **Other Property**.

**(4)** Loss of or loss from damage to any books or records of account or other records, tapes, disks, or electronic media used by an **Insured** in the business but only if such books, records, tapes or disks are actually reproduced and then only for not more than the blank books, pages, tapes and disks or other materials plus the cost of labor for the actual transcription or copying of data which an **Insured** shall furnish to reproduce such books, records, tapes or disks.

**(5)** The foregoing notwithstanding, in the event of loss of **Virtual Currency** covered under this Policy, the Insurer may, at its option:

**(a)** tender the value of the **Virtual Currency** in actual currency of the country in which the loss was sustained, or in the U.S. dollar equivalent, by taking the weighted average of the values of **Virtual Currency** in such actual currency as posted on the three largest relevant **Virtual Currency** exchanges, based on the volume of **Virtual Currency** exchanged, as of 12:00 PM EST on the day the loss is discovered; or

**(b)** replace the quantity of **Virtual Currency** of such loss.

**(M) RECORDS**

The **Insured** must keep records of all **Money, Securities** and **Other Property** covered under this **Non-Liability Coverage Part** so that the Insurer can verify the amount of any loss.

**ENDORSEMENT NO:**1

This endorsement, effective 12:01 am, 5/17/19                                                                                forms part
of policy number      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**              TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under all lines of insurance in this policy subject to the Terrorism Risk Insurance Act.

**A.  Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Department of the Treasury will reimburse insurers for 85% of that portion of insured losses attributable to "certified acts of terrorism" that exceed the applicable insurer deductible. Effective January 1, 2016, this percentage will be reduced to 84%, effective January 1, 2017 to 83%, effective January 1, 2018 to 82% effective January 1, 2019 to 81%, and effective January 1, 2020 to 80%. However, if aggregate insured losses under the Terrorism Risk Insurance Act, as amended (TRIA), exceed $100 billion in a Calendar Year, the Treasury shall not make any payment for any portion of such losses that exceeds $100 billion. The United States government has not charged any premium for their participation in covering terrorism losses.

**B.  Cap On Certified Terrorism Losses**

A "certified act of terrorism" means an act that is certified by the Secretary of the Treasury in accordance with the provisions of TRIA to be an act of terrorism under TRIA. The criteria contained in TRIA, for a "certified act of terrorism" include the following:

**1.**   The act results in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

**2.**   The act results in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

**3.**   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to "certified acts of terrorism" under TRIA, exceeds $100 billion in a Program Year (January 1 through December 31) and we have met, or will meet, our insurer deductible under TRIA, we shall not be liable for the payment of any portion of such losses that exceeds $100 billion. In such case, your coverage for terrorism losses may be reduced on a pro rata basis in accordance with procedures established by the Treasury,, based on its estimates of aggregate industry losses and our estimate that we will exceed our insurer deductible. In accordance with the Treasury's procedures, amounts paid for losses may be subject to further adjustments based on differences between actual losses and estimates.

**C.  Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omissions of a terrorism exclusion, or inclusion of coverage for terrorism, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by any Nuclear Liability Exclusion, Pollution Exclusion, or War Exclusion.

All other terms and conditions remain unchanged.

**ENDORSEMENT NO:**2

**This endorsement, effective 12:01 am,** 5/17/19    **forms part of policy number**    83 KB 0336944-19

**issued to:**    VONACHEN GROUP

**by:**    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIFIC PROCEEDING EXCLUSION
## (LIABILITY COVERAGE PARTS)

This endorsement modifies insurance provided under:

**PRIVATE CHOICE PREMIER**<sup>SM</sup> **POLICY**

Check those boxes that apply:

☐  **DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART**, section **IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS.**

☒  **EMPLOYMENT PRACTICES LIABILITY COVERAGE PART,** section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, (A).**

☐  **FIDUCIARY LIABILITY COVERAGE PART**, section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, (A).**

The foregoing Selected Sections shall each be amended by the addition of the exclusion listed below:

• in connection with any **Claim** based upon, arising from, or in any way related to the following proceedings:

  Chubb Claim#403351, Heather Archard, DOL 8/18/17

  or the same or substantially the same facts, circumstances or allegations which are the subject of or the basis for such proceedings.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:3

**This endorsement, effective 12:01 am,** 5/17/19                                    **forms part**
**of policy number**       83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**          TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND CANCELLATION PROVISION/20 DAYS NOTICE UNEARNED PREMIUM PRO RATA (COMMON TERMS AND CONDITIONS)

This endorsement modifies insurance provided under:

**PRIVATE CHOICE PREMIER**$^{SM}$ **POLICY**

The **COMMON TERMS AND CONDITIONS**, section **XIII. CANCELLATION, (A)** and **(C)** are deleted and replaced with the following:

**(A)** The Insurer may cancel this Policy for non-payment of premium by sending not less than 20 days notice to the **Named Entity**. This Policy may not otherwise be cancelled by the Insurer.

**(C)** If the Insurer or **Named Entity** cancels this Policy, unearned premium shall be calculated on a pro rata basis. Payment of any unearned premium shall not be a condition precedent to the effectiveness of a cancellation. The Insurer shall make payment of any unearned premium as soon as practicable.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

PP 00 H107 00 0417                     © 2017, The Hartford                     Page 1 of 1

**ENDORSEMENT NO:**4

**This endorsement, effective 12:01 am,** 5/17/19                                                **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**               TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SINGLE RETENTION - CLAIMS COVERED UNDER
### MULTIPLE COVERAGE PARTS ENDORSEMENT
### (COMMON TERMS AND CONDITIONS)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**[SM] **POLICY**

**COMMON TERMS AND CONDITIONS** Section **VI, RETENTION, (D)** is deleted and replaced with the following:

(D) If a **Claim** is covered under more than one Coverage Part, a single Retention will be applied to such **Claim** in an amount equal to the highest of applicable Coverage Part Retentions. No other Retentions will apply to such **Claim**.


All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**5

**This endorsement, effective 12:01 am,** 5/17/19             **forms part**
**of policy number**     83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**              TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXTENDED REPORTING PERIOD – 90 DAY ELECTION PERIOD
## (COMMON TERMS AND CONDITIONS)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**<sup>SM</sup> **POLICY**

**COMMON TERMS AND CONDITIONS**, section **IX, EXTENDED REPORTING PERIOD, (B)** is deleted and replaced with the following:

    **(B)** To elect the Extended Reporting Period, the **Insureds** shall send a written notice of election of the Extended Reporting Period to the Insurer together with the premium therefor. The right to elect the Extended Reporting Period shall end unless the Insurer receives such notice and premium within ninety (90) days of cancellation or non-renewal. There shall be no right to elect the Extended Reporting Period after such time.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**6

**This endorsement, effective 12:01 am,** 5/17/19                                                                           **forms part**
**of policy number**        83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**          TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFENSE AND SETTLEMENT ENDORSEMENT – WITHIN RETENTION (COMMON TERMS AND CONDITIONS)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**<sup>SM</sup> **POLICY**

**COMMON TERMS AND CONDITIONS**, section **VII, DEFENSE AND SETTLEMENT, (C)** is deleted and replaced by:

(C)  The **Insureds** shall not admit or assume any liability, make any settlement offer or enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** regarding any **Claim** without the prior written consent of the Insurer, such consent not to be unreasonably withheld. However, the **Insureds** may, without the consent of the Insurer, enter into a complete and final settlement agreement of a **Claim** in which the total of the **Damages** and the **Defense Costs** does not exceed the applicable retention. The Insurer shall have no obligation to pay either **Damages** or **Defense Costs** incurred in the defense or settlement of the **Claim.** The Insurer shall not be liable for any admission, assumption, settlement offer or agreement, stipulation, or **Defense Costs** to which it has not consented.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:7

**This endorsement, effective 12:01 am,** 5/17/19                                                      **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**               TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF SUBSIDIARY – ADD CONTROLLED 501c(3) ORGANIZATIONS
## (COMMON TERMS AND CONDITIONS)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**$^{SM}$ **POLICY**

The **COMMON TERMS AND CONDITIONS**, section **II. COMMON DEFINITIONS,** the definition of **"Subsidiary", (5)** is
deleted and replaced by the following:

(5)  foundation, charitable trust, political action committee or any IRS 501c(3) organization in which and so long as such
      entity or organization is controlled by the **Named Entity** or any **Subsidiary** as defined in (1) through (4) above.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

PP 00 H113 00 0517                        © 2017, The Hartford                        Page 1 of 1

**ENDORSEMENT NO:**8

**This endorsement, effective 12:01 am,** 5/17/19                                          **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**         VONACHEN GROUP

**by:**            TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDED BODILY INJURY AND PROPERTY DAMAGE EXCLUSION - NO EXCEPTIONS
### (DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**$^{SM}$ **POLICY**

**DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART,** section **IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, (A)** is deleted and replaced by:

**(A)** in connection with any **Claim** based upon, arising from, or in any way related to bodily injury, sickness, disease, mental anguish, emotional distress, or death of any person, or damage to or destruction of any tangible property, including loss of use or diminution of value thereof;

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**9

**This endorsement, effective 12:01 am,** 5/17/19                    **forms part**
**of policy number**    83 KB 0336944-19

**issued to:**         VONACHEN GROUP

**by:**              TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### MODIFIED UNFAIR TRADE PRACTICES EXCLUSION ENDORSEMENT
### (DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**[SM] **POLICY**

**DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART** is amended as follows:

Section **V. EXCLUSIONS APPLICABLE TO INSURING AGREEMENT (C) (A) (6)** is deleted and replaced with the following:

**(7)**  violation of the Federal Trade Commission Act.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:10

**This endorsement, effective 12:01 am,** 5/17/19                                                    **forms part**
**of policy number**        83 KB 0336944-19

**issued to:**            VONACHEN GROUP

**by:**                TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXCLUSION FOR MANUFACTURING AND PROFESSIONAL SERVICE ENDORSEMENT
### *(DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART)*

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER® POLICY**

The **DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART** is amended as follows:

I.   Section **IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS** is amended by the addition of the following:

- in connection with any **Claim** based upon, arising from, or in any way related to any actual or alleged:

   **(1)** malfunction of any product, or failure of any product to perform in any manner as a result of any deficiency, inadequacy, unfitness, defect or dangerous condition in any product or in its design or manufacture; or

   **(2)** rendering of, or failure to render, any services for or on behalf of others for a fee, including, without limitation, services performed by or on behalf of the **Insureds** for or on behalf of a customer or client;

   provided, however, that this exclusion shall not apply to the portion of **Loss** directly resulting from: (i) a civil proceeding brought by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**; or (ii) a **Derivative Action** or a **Derivative Demand**.

II.  Section **V. EXCLUSIONS APPLICABLE TO INSURING AGREEMENT (C),** sub-paragraph **(C)** is deleted.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:11

**This endorsement, effective 12:01 am,** 5/17/19                                                   **forms part**

**of policy number**     83 KB 0336944-19

**issued to:**           VONACHEN GROUP

**by:**                TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### INDEPENDENT CONTRACTOR EXTENSION WITH INDEMNIFICATION REQUIREMENT (DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under:

**PRIVATE CHOICE PREMIER**<sup>SM</sup> **POLICY**

The **DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART** is amended as follows:

I.   Section **II. DEFINITIONS**, the definition of **Insured Person**, is amended by the addition of the following:

- Solely for the Directors, Officers and Entity Liability Coverage Part, **Manager** also means any "**Independent Contractor**", but only:

   (a)  while she/he is acting on behalf of an **Insured Entity**; and

   (b)  if and to the extent that the **Insured Entity** agrees to indemnify her/him in the same manner as the **Insured Entity's Managers** for liability for **Loss**.

II.  Section **II. DEFINITIONS** is amended by the addition of the following:

- "**Independent Contractor**" means any natural person working in the capacity of an independent contractor pursuant to an **Independent Contractor Agreement**.
- "**Independent Contractor Agreement**" means any express contract or agreement between an **Independent Contractor** and an **Insured Entity** specifying the terms of the **Insured Entity's** engagement of such **Independent Contractor**.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:12

**This endorsement, effective 12:01 am,** 5/17/19                                    **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**                TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF ENTITY CLAIM
## INCLUDE COVERAGE FOR ADMINISTRATIVE OR REGULATORY PROCEEDINGS
## (DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under:

**PRIVATE CHOICE PREMIER**[SM] **POLICY**

The **DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART**, Section **II. DEFINITIONS,** the definition of **"Entity Claim"**, is amended by the addition of the following:

> **Entity Claim** also means any formal administrative or regulatory proceeding against an **Insured Entity**, commenced by the filing of a notice of charges, or similar document, but only while such proceeding is also pending against an **Insured Person.**

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

PP 00 H358 00 0417                        © 2017, The Hartford                        Page 1 of 1

**ENDORSEMENT NO:**13

**This endorsement, effective 12:01 am,** 5/17/19                                               **forms part**
**of policy number**       83 KB 0336944-19

**issued to:**           VONACHEN GROUP

**by:**                TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDED BODILY INJURY AND PROPERTY DAMAGE EXCLUSION – NO EXCEPTIONS
### (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**$^{SM}$ **POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART,** section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, **(A), (1)** is deleted and replaced by:

(1)   in connection with any **Claim** based upon, arising from, or in any way related to bodily injury, sickness, disease, death, false arrest or imprisonment, abuse of process, malicious prosecution, trespass, nuisance or wrongful entry or eviction, or for injury to or destruction of any tangible property, including loss of use or diminution of value thereof;

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:14

**This endorsement, effective 12:01 am,** 5/17/19                                                      forms part
**of policy number**      83 KB 0336944-19

**issued to:**        VONACHEN GROUP

**by:**        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WORKPLACE VIOLENCE COVERAGE ENDORSEMENT
## (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER<sup>SM</sup> POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART** is amended as follows:

I.    Section **I. INSURING AGREEMENTS** is amended by the addition of the following:

- **WORKPLACE VIOLENCE**

    The **Insurer** will pay on behalf of the **Insured Entity** any **Workplace Violence Expenses** resulting from a **Workplace Violence Action** occurring during the Policy Period and reported to the Insurer pursuant to the terms of the policy.

    The Insurer's maximum aggregate liability for all such **Workplace Violence Expenses** shall be the Sub-Limit of Liability shown in Item 5 of the Declarations. This Sub-Limit shall be part of, and not in addition to, the Aggregate Limit of Liability for this **Liability Coverage Part** shown on the Declarations. Payment of **Workplace Violence Expenses** by the Insurer shall reduce such Aggregate Limit of Liability. No Retention shall apply to the coverage provided under this Endorsement.

II.    Solely for the purpose of the coverage provided by this endorsement, Section **II. DEFINITIONS** is amended by the addition of the following:

- **Business Interruption Expenses** means the amount calculated as set forth below for a period of time commencing the day the **Workplace Violence Action** occurs and ending on the earlier of ninety (90) days following such date or the date that the **Insured Entity** restores operations, with due diligence and dispatch, to the level that existed prior to the **Workplace Violence Action**:

    (1)    The sum of:

        a)    net profits before income taxes that would have been earned had no **Workplace Violence Action** occurred;

        b)    the actual costs of continuing the activities which are necessary for the **Insured Entity** to resume operations with substantially the same quality of service which existed immediately preceding the **Workplace Violence Action**; and

        c)    reasonable expenses which would not have been incurred except for such **Workplace Violence Action** and which were incurred by the **Insured Entity** for the sole purpose of reducing **Business Interruption Expenses** described in 1(a) or 1(b), not to exceed the amount of actual reduction of such **Business Interruption Expenses**.

    (2)    Less the sum of:

PP 00 H426 00 0616                              © 2016, The Hartford                              Page 1 of 3

    a) all recoveries, other insurance, suretyship and other indemnity which cover **Business Interruption Expenses**; and

    b) the amount by which the **Insured Entity** reasonably could have, but failed to, reduce **Business Interruption Expenses**.

- **Employee Expenses** means the reasonable fees and expenses for, or cost of:

    (1) the salary or wages, for up to ninety (90) days following the date of the **Workplace Violence Action** occurs, that the **Insured Entity** pays **Individual Insureds** victimized by the **Workplace Violence Action** and unable to continue to work because of such **Workplace Violence Action**. The **Individual Insured**'s salary or wages in effect at the time of the **Workplace Violence Action** shall apply;

    (2) the salary or wages, for up to ninety (90) days following the date of the **Workplace Violence Action** occurs, that the **Insured Entity** pays a newly hired person(s) or temporary employee(s) to work because of such **Workplace Violence Action**; however such salary or wage shall not exceed the salary or wage of the relevant victimized **Individual Insured**(s) in effect at the time of the **Workplace Violence Action**;

    (3) reasonable expenses for a counseling seminar for **Individual Insureds** conducted by an independent consultant within ninety (90) days following the **Workplace Violence Action**;

    (4) reasonable expenses for the hiring of an independent security guard for up to thirty (30) days following the **Workplace Violence Action**; or

    (5) reasonable expenses for the services of an independent security consultant for purposes of devising a security plan for the **Insured Entity**.

- **Individual Insured** means any:

    (1) **Manager**;

    (2) **Employee**; or

    (3) Natural person visiting the **Premises** for a lawful purpose.

- **Physical Injury** means physical damage to a person's body caused by an external source.
- **Premises** means any building, facility, or property occupied by the **Insured Entity** in conducting its operations.
- **Public Relations Firm Expenses** means the reasonable and necessary fees charged by an organization specializing primarily in maintaining or restoring the public image of businesses or non-profit organizations, where such organization is retained to aid in the restoration of the **Insured Entity**'s public image.
- **Workplace Violence Action** means any actual or alleged intentional and unlawful use of deadly force with an intent to cause harm that occurs at the **Premises** that results in **Physical Injury**.
- **Workplace Violence Expenses** means:

    (1) **Business Interruption Expenses**;

    (2) **Employee Expenses**; and

    (3) **Public Relation Firm Expenses**.

III. Solely for the purpose of the coverage provided by this endorsement, Section **III., EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS** is amended by the addition of the following:

- The Insurer shall not pay any **Workplace Violence Expenses**:

    (1) based upon, arising from, or in any way related to war, invasion, insurrection, riot, rebellion, revolution, civil war, or military action; or

   (2)  based upon, arising from, or in any way related to the use or threat of force or violence occurring for the purpose of demanding money, securities, or property.

- The Insurer shall not pay any legal costs, attorneys fees, expenses, settlements, judgments, penalties or other amounts incurred as a result of any claim, suit or other legal proceeding brought against an **Insured** in connection with a **Workplace Violence Action**.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**15

**This endorsement, effective 12:01 am,** 5/17/19 **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**                TWIN CITY FIRE INSURANCE CO.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EMPLOYMENT CRISIS FUND SUBLIMIT ENDORSEMENT**
**(EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)**

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER℠ POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART** is amended in the following manner:

I.  Section **I, INSURING AGREEMENTS,** is amended by the addition of the following:

   **Employment Management Crisis Coverage**

   The Insurer will reimburse the **Employment Crisis Costs** incurred by an **Insured Entity** as a result of any **Employment Management Crisis** which first occurs during the **Policy Period**

   This Insuring Agreement shall be subject to the Employment Crisis Sublimit of <u>$25,000</u>.

   Such Sub-limit of Liability shall be the maximum aggregate amount that the Insurer shall pay under this Insuring Agreement for all **Loss** from all **Claims** covered under this Insuring Agreement.

II. Section **II. DEFINITIONS**, is amended by the addition of the following:

   ● **"Employment Crisis Costs"** means reasonable and necessary costs and expenses billed by a crisis management firm:

   (1) hired by the **Insured** solely to mitigate the negative impact of an **Employment Management Crisis;** and

   (2) approved in writing by the Insurer. Such approval will not be unreasonably withheld.

   ● **"Employment Management Crisis"** means:

   (1) the termination of thirty percent (30%) or greater of the workforce of the **Insured Entity** if such terminations had not been discussed or planned prior to three (3) months before actually occurring;

   (2) an internal notification to the **Insured Entity's** Human Resource Department, or other designated internal representative, of allegations of discrimination or harassment implicating a duly elected or appointed director, advisory director, board observer, advisory board member, officer, member of the board of managers or management committee member of an **Insured Entity**;

   (3) receipt by an **Insured** of notice that a civil rights organization or public interest group is investigating the **Insured** for violations of employment laws or is distributing literature which accuses the **Insured** of violations of employment laws; or

**(4)** a congressional inquiry regarding the **Insured's** violations of employment laws.

All other terms and conditions remain unchanged.

Douglas Elliot, President

© 2016, The Hartford

ENDORSEMENT NO:16

**This endorsement, effective 12:01 am,** 5/17/19                                              **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**            TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED RETENTION WAIVER
## (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**<sup>SM</sup> **POLICY**

The **EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, Section **VII. RETENTION WAIVER**, is deleted and replaced with the following:

The Retention not shall apply to **Defense Costs** incurred in connection with a covered **Claim**, and the Insurer shall reimburse the **Insureds** for 50% of any covered **Defense Costs** paid by the **Insureds** within the Retention otherwise applicable to such **Claim**, if a final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment establishes that none of the **Insureds** in such **Claim** are liable for any **Loss** other than **Defense Costs**.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**17

This endorsement, effective 12:01 am, 5/17/19                                                         forms part
of policy number      83 KB 0336944-19

**issued to:**            VONACHEN GROUP

**by:**              TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED DEFINITION OF RETALIATION
## (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**<sup>SM</sup> **POLICY**

Section **II. DEFINITIONS, "RETALIATION"** is deleted and replaced with the following:

- **"Retaliation"** means adverse treatment of an **Employee** or **Independent Contractor** based upon any **Employee** or **Independent Contractor**:

    **(1)** Exercising any rights under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, **ERISA**, or the Americans with Disabilities Act;

    **(2)** Refusing to violate any law;

    **(3)** Assisting, testifying, or cooperating with a proceeding or investigation regarding alleged violations of law by any **Insured**;

    **(4)** Disclosing or threatening to disclose alleged violations of law to a supervisor or to any governmental agency; or

    **(5)** Filing any "whistle blower" claim against any **Insured** under the federal False Claims Act, the Sarbanes-Oxley Act of 2002, or any similar law.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**18

**This endorsement, effective 12:01 am,** 5/17/19                                          **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**           VONACHEN GROUP

**by:**                  TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND NOTICE OF CLAIM – SECTION VI (B)(2)
## (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**SM **POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, section **VI, NOTICE OF CLAIM, (B)(2)** is deleted and replaced with the following:

   **(2)**  three hundred and sixty five (365) days after the renewal date, if this Policy is renewed with the Insurer**;** or

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:19

**This endorsement, effective 12:01 am,** 5/17/19                                                           **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**                TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ORDER OF PAYMENTS
## (FIDUCIARY LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**[SM] **POLICY**

The following section is added to the **FIDUCIARY LIABILITY COVERAGE PART**:

- **ORDER OF PAYMENTS**

  If **Loss** is incurred that is acknowledged by the Insurer to be covered under this **Liability Coverage Part**, the Insurer shall first pay **Loss** covered under Insuring Agreement (A) of an **Insured Person** acting in the capacity as a fiduciary prior to paying **Loss** to any other **Insured** or under any other Insuring Agreement.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

PP 00 H503 01 0517                          © 2017, The Hartford                          Page 1 of 1

ENDORSEMENT NO:20

This endorsement, effective 12:01 am, 5/17/19                                                        forms part
of policy number      83 KB 0336944-19

issued to:          VONACHEN GROUP

by:                 TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TELEPHONE AND TOLL FRAUD COVERAGE ENDORSEMENT
## (CRIME COVERAGE PART)

This endorsement modifies insurance provided under:

**PRIVATE CHOICE PREMIER**$^{SM}$ **POLICY**

The **Crime Coverage Part** is amended as follows:

I.   Section I. **INSURING AGREEMENTS**, is amended by the addition of the following:

**INSURING AGREEMENT - TELEPHONE AND TOLL FRAUD**

The Insurer will pay for **Telephone and Toll Fraud Loss** resulting from **Telephone System Access Fraud**, subject to the Limit of Insurance and Retention stated in the SCHEDULE below, which shall be deemed part of Item 1 the Declarations:

***TELEPHONE AND TOLL FRAUD LIMIT AND RETENTION SCHEDULE***

Limit shall be $1,000,000 or a limit equal to the Limit of Insurance shown on the CRIME COVERAGE PART Declarations under ITEM 1 Insuring Agreement 1, whichever is lesser. In no event, shall said limit exceed $1,000,000. Retention shall be $10,000 or a retention equal to the Retention Amount shown on the CRIME COVERAGE PART Declarations under ITEM 1 Insuring Agreement 1, whichever is lesser.

II.  Section **II. LIMIT OF INSURANCE** is amended by the addition of the following:

Coverage for **Telephone System Access Fraud** is further limited to **Telephone and Toll Fraud Loss** incurred in a maximum period of 30 consecutive days beginning with the first day that **Telephone System Access Fraud** is discovered.

III. Section **IV. DEFINITIONS**, is amended by the addition of the following:

- **Insured's Telephone System** means any equipment, software, or systems, including but not limited to private branch exchange (PBX) and remote access systems, owned or leased by the **Insured** for purposes of voice call based communications.
- **Telephone System Access Fraud** means the use of a computer by someone other than an **Employee** to gain unauthorized access to the **Insured's Telephone System** resulting in **Telephone and Toll Fraud Loss**.
- **Telephone and Toll Fraud Loss** means tolls and associated long distance charges the **Insured** is responsible for directly as a result of **Telephone System Access Fraud**. **Telephone and Toll Fraud Loss** shall not include late charges or other penalties issued by a telephone carrier.

IV.  Section **V. EXCLUSIONS** is amended by the addition of the following:

Loss resulting from the use of a calling card, telephone access card, or telephone credit card.

PP 00 H672 00 0217                          © 2017, The Hartford                              Page 1 of 2

**ENDORSEMENT NO:** 20

All other terms and conditions remain unchanged.

Douglas Elliot, President

ENDORSEMENT NO:21

This endorsement, effective 12:01 am, 5/17/19                                                    forms part
of policy number      83 KB 0336944-19

issued to:            VONACHEN GROUP

by:                   TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ILLINOIS AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER<sup>SM</sup> POLICY**

**COMMON TERMS AND CONDITIONS** is amended as follows:

I.   Section **II. COMMON DEFINITIONS** the definition of **"Defense Costs,"** is deleted and replaced with the following:

- **"Defense Costs"** means:

  (1)  reasonable legal fees and expenses incurred in the defense or appeal of a **Claim**;

  (2)  **Extradition Costs**; or

  (3)  the costs of appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to furnish such bonds.

  However, **Defense Costs** shall not include:

  (a)  salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds** or Insurer;

  (b)  any fees, expenses or costs which are incurred by or on behalf of a party which is not a covered **Insured**; or

  (c)  any fees, expenses or costs which were incurred prior to the date on which the Insurer received written notice of **Claim** from the **Insured**.

II.  Section **II. COMMON DEFINITIONS**, the definition of **"Pollutants,"** is deleted and replaced with the following:

- **"Pollutants"** means any solid, liquid, gaseous or thermal irritant, nuisance or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalies, chemicals, odors, noise, lead, oil or oil product, radiation, asbestos or asbestos-containing product, and waste. Waste includes, without limitation, material to be recycled, reconditioned or reclaimed. **Pollutants** also means any substance located anywhere in the world identified on a list of hazardous substances issued by any federal agency (including, nonexclusively, the Environmental Protection Agency) or any state, county, municipality or locality or counterpart thereof, or any foreign equivalent thereof.

III. Section **II. COMMON DEFINITIONS** is amended to include the following:

- **"Hostile Fire"** means one which becomes uncontrollable or breaks out from where it was intended to be.

IV.  Section **III. COVERAGE EXTENSIONS**, **(A) Spousal/Domestic Partnership Liability Coverage** is amended to include the following:

  Any use of the terms "spouse", "relative", "family", "immediate family", "dependent", or any other term descriptive of spousal relationships used in this Policy, includes a party to a civil union as recognized under Illinois law.

V.   Section **IX. EXTENDED REPORTING PERIOD**, paragraph **(A)** is deleted and replaced with the following:

**ENDORSEMENT NO:** 21

**(A)** If any **Liability Coverage Part** is cancelled or non-renewed for any reason, the **Insureds** shall have the right to elect an extension of time to report **Claims** under such **Liability Coverage Part** (the "Extended Reporting Period").

**VI.** Section **XII. OTHER INSURANCE** is deleted and replaced with the following:

**XII. OTHER INSURANCE**

If **Loss** arising from any **Claim** is insured under any other valid and collectible policy or policies (other than policies written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number), then the Insurer shall not be liable under this Policy for a greater proportion of such **Claim** than the applicable Limit of Liability stated in the Declaration page of this Policy bears to the total applicable limit of liability of all valid and collectible coverage against such **Claim**. Any payments made under any such policy(ies) will serve to offset any applicable retention amounts set forth in the Declarations.

**VII. COMMON TERMS AND CONDITIONS**, section **XVII. ACTION AGAINST THE INSURER, (B)** and **(C)** are deleted and replaced with the following:

**(B)** Solely with respect to the **Crime Coverage Part**:

  **(1)** No legal action shall be taken against the Insurer involving loss unless the **Insured** has complied with all the terms of this Policy; and

  **(2)** No legal action shall be taken against the Insurer involving loss until ninety (90) days after the **Insured** has filed proof of loss with us; and

  **(3)** No legal action shall be taken against the Insurer involving loss unless such action is brought within two (2) years from the date that the **Insured** discovers such loss. Any period of time for filing suit against company must be extended by the number of days between the date the proof of loss was filed and the date the claim was denied in whole or in part.

**(C)** Solely with respect to the **Kidnap And Ransom/Extortion Coverage Part**:

No suit, action or proceeding for recovery of any claim under this Policy shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this Policy shall have been complied with and the same be commenced within twenty-four (24) months after a claim for actual loss or expenses has been reported to the Insurer by the **Insured**. Any period of time for filing suit against company must be extended by the number of days between the date the proof of loss was filed and the date the claim was denied in whole or in part.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:22

**This endorsement, effective 12:01 am,** 5/17/19                                                        **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**           VONACHEN GROUP

**by:**             TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ILLINOIS CHANGES
### (CRIME COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**SM **POLICY**

The **Crime Coverage Part** is amended as follows:

**I.** Section **VI. GENERAL CONDITIONS**, **(G) DISCOVERY - EXTENDED PERIOD TO DISCOVER LOSS** is deleted and replaced with the following:

  **(G) DISCOVERY - EXTENDED PERIOD TO DISCOVER LOSS**

  The Insurer will pay for loss that an **Insured** sustained prior to the effective date of termination or cancellation of this **Non-Liability Coverage Part**, which is discovered by the **Insured**:

  **(1)** no later than ninety (90) days from the date of the termination, cancellation or non-renewal; and

  **(2)** as respects any **Employee Benefit Plan(s)**, no later than one (1) year from the date of that termination, cancellation or non-renewal.

  However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** to replace, in whole or in part, the insurance afforded by this **Non-Liability Coverage Part**.

**II.** Section **VI. GENERAL CONDITIONS**, **(J) JOINT INSURED**, paragraph **(4)** is deleted.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:23

**This endorsement, effective 12:01 am,** 5/17/19                                      **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**               TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ILLINOIS CHANGES
### (DIRECTORS, OFFICERS AND ENTITY LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**<sup>SM</sup> **POLICY**

The **Directors, Officers and Entity Liability Coverage Part** is amended as follows:

**I.**   Section **II. DEFINITIONS**, the definition of **"Damages,"** is amended to include the following:

With respect to the insurability of punitive or exemplary damages in the state of Illinois, **Damages** does not include coverage for punitive or exemplary damages assessed as a result of the **Insured's** own misconduct.  However, the Insurer shall pay **Defense Costs** for punitive and/or exemplary damages, which are incurred solely as a result of a **Claim** involving both (i) punitive and/or exemplary damages and (ii) compensatory damages.

Pre- or post-judgment interest will not reduce the Limit of Liability.

**II.**  Section **IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, paragraph **(D)** is amended to include the following:

This exclusion does not apply to **Loss** arising out of heat, smoke or fumes from a **Hostile Fire.** This exception does not apply to **Damages** or **Defense Costs** arising out of bodily injury or property damage.

**III.** Section **X. NOTICE OF CLAIM** is amended by deleting the restriction stating "if the Policy is cancelled for nonpayment of premium, the **Insured** will give the Insurer written notice of such **Claim** prior to the effective date of cancellation."

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

PP 12 H097 00 0616                          © 2016, The Hartford                          Page 1 of 1

ENDORSEMENT NO:24

**This endorsement, effective 12:01 am,** 5/17/19                                                   forms part
**of policy number**      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**          TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ILLINOIS CHANGES
### (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**<sup>SM</sup> **POLICY**

The **Employment Practices Liability Coverage Part** is amended as follows:

I.    Section **II. DEFINITIONS**, the definition of **"Damages,"** is amended to include the following:

With respect to the insurability of punitive or exemplary damages in the state of Illinois, **Damages** does not include coverage for punitive or exemplary damages assessed as a result of the **Insured's** own misconduct.  However, the Insurer shall pay **Defense Costs** for punitive and/or exemplary damages, which are incurred solely as a result of a **Claim** involving both (i) punitive and/or exemplary damages and (ii) compensatory damages.

Pre- or post-judgment interest will not reduce the Limit of Liability.

II.   Section **VI. NOTICE OF CLAIM** is amended by deleting the restriction stating "if the Policy is cancelled for nonpayment of premium, the **Insured** will give the Insurer written notice of such **Claim** prior to the effective date of cancellation."

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

PP 12 H098 00 0616                              © 2016, The Hartford                              Page 1 of 1

**ENDORSEMENT NO:**25

**This endorsement, effective 12:01 am,** 5/17/19                                    **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**        VONACHEN GROUP

**by:**          TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ILLINOIS CHANGES
### (FIDUCIARY LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**PRIVATE CHOICE PREMIER**<sup>SM</sup> **POLICY**

The **Fiduciary Liability Coverage Part** is amended as follows:

**I.** Section **II. DEFINITIONS**, the definition of **"Damages,"** is amended to include the following:

> With respect to the insurability of punitive or exemplary damages in the state of Illinois, **Damages** does not include coverage for punitive or exemplary damages assessed as a result of the **Insured's** own misconduct.  However, the Insurer shall pay **Defense Costs** for punitive and/or exemplary damages, which are incurred solely as a result of a **Claim** involving both (i) punitive and/or exemplary damages and (ii) compensatory damages.

> Pre- or post-judgment interest will not reduce the Limit of Liability.

**II.** Section **III. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**, paragraph **(A)**, paragraph **(4)** is amended to include the following:

> This exclusion does not apply to **Loss** arising out of heat, smoke or fumes from a **Hostile Fire.** This exception does not apply to **Damages** or **Defense Costs** arising out of bodily injury or property damage.

**III.** Section **VIII. NOTICE OF CLAIM** is amended by deleting the restriction stating "if the Policy is cancelled for nonpayment of premium, the **Insured** will give the Insurer written notice of such **Claim** prior to the effective date of cancellation.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:** 26

**This endorsement, effective 12:01 am,**  5/17/19  **forms part of policy number**  83 KB 0336944-19

**issued to:**  VONACHEN GROUP

**by:**  TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ILLINOIS CANCELLATION AND NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Name of Insured, Name of Company, Name of Partnership, Parent Company, Name of Insured Plan or Trust, Name of Insured Entity, Named Entity, Named Real Estate Investment Trust(s), Name of Sponsor Company or Insured stated in ITEM A or ITEM 1 of the Declarations Page.

I.   The Cancellation provision of the Policy is deleted and replaced by the following:

NOTICE OF CANCELLATION

A.   The **Insured** may cancel this Policy by mailing to the **Insurer** advance written Notice of Cancellation stating when thereafter such cancellation shall be effective.

B.   The **Insurer** may only cancel this Policy for nonpayment of premium by mailing to the **Insured** written Notice of Cancellation at least ten (10) days before the effective date of cancellation.

C.   The **Insurer** will mail the Notice of Cancellation to the **Insured** and the agent or broker at the last addresses known to the **Insurer**.

D.   Notice of Cancellation will state the effective date of cancellation and a specific explanation of the reason or reasons for cancellation. The **Policy Period** will end on that date.

E.   If this Policy is cancelled, the **Insurer** will send the **Insured** any premium refund due. If the **Insurer** cancels, the refund will be pro rata. If the **Insured** cancels, the refund may be less than pro rata. The cancellation will be effective even if the **Insurer** has not made or offered a refund.

F.   Proof of mailing will be a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service.

II.  The following provision is added:

NOTICE OF NONRENEWAL

A.   If the **Insurer** decides not to renew this Policy, the **Insurer** will mail written notice stating the reason for non-renewal to the **Insured's** last mailing address known to the **Insurer** at least sixty (60) days before the expiration date of the Policy. A copy of the notice will also be sent to:

1.   The broker, if known to the **Insurer**, or the agent of record; and

2.   The last known mortgagee or lien holder at the last mailing address known to the **Insurer**.

B.   This paragraph does not apply if the **Insurer** has manifested a willingness to renew directly to the **Insured**.

**ENDORSEMENT NO:** 26

C.   Proof of mailing will be a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**Named Insured:**          VONACHEN GROUP

**Effective Date:**          5/17/19

**Insurer:**          TWIN CITY FIRE INSURANCE CO.

**Policy Number:**          83 KB 0336944-19

## TERRORISM RISK INSURANCE ACT

## CONFIRMATION OF ACCEPTANCE OF CERTIFIED ACTS OF TERRORISM

We previously notified you that in accordance with the federal Terrorism Risk Insurance Act, as amended (TRIA), we must make "certified acts of terrorism" coverage available in the policies we offer.

The terrorism coverage as defined by the Act does not apply to Crime or Miscellaneous Professional Liability coverage parts, if any or all of those coverage parts are elected under this policy.

A "certified act of terrorism" means an act that is certified by the Secretary of the Treasury in accordance with the provisions of TRIA to be an act of terrorism under TRIA. The criteria contained in TRIA for "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2. The act resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

3. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The United States Department of the Treasury will reimburse insurers for 85% of that portion of insured losses attributable to certified acts of terrorism that exceeds the applicable insurer deductible. Effective January 1, 2016, this percentage will be reduced to 84%, effective January 1, 2017 to 83%, effective January 1, 2018 to 82%, effective January 1, 2019 to 81%, and effective January 1, 2020 to 80%. However, if aggregate insured losses under TRIA exceed $100 billion in a Calendar Year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion. The United States government has not charged any premium for their participation in covering terrorism losses.

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a Calendar Year and we have met, or will meet, our insurer deductible under TRIA, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, your coverage for terrorism losses may be reduced on a pro rata basis in accordance with procedures established by the Treasury, based on its estimates of aggregate industry losses and our estimate that we will exceed our insurer deductible. In accordance with the Treasury's procedures, amounts paid for losses may be subject to further adjustments based on differences between actual losses and estimates.

At that time we advised you that you will not be required to pay a premium for "certified acts of terrorism" coverage at this time. As a result of our notification, you have accepted "certified acts of terrorism" coverage. If, upon renewal of your policy, a premium is going to be charged for "certified acts of terrorism" coverage, we will provide you with notification of what that premium will be.



# U.S. DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by the United States. **Please read this Notice carefully**.

The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States. OFAC acts under Presidential national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction. OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called "Specially Designated Nationals and Blocked Persons" or "SDNs". Their assets are blocked and U.S. persons are generally prohibited from dealing with them. This list can be located on OFAC's web site at — http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is an SDN, as identified by OFAC, the policy is a blocked contract and all dealings with it must involve OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.



**Producer Compensation Notice**

You can review and obtain information on The Hartford's
producer compensation practices at www.thehartford.com
or at 1-800-592-5717.

# IMPORTANT INFORMATION FOR
# ILLINOIS POLICYHOLDER

IN THE EVENT YOU NEED TO CONTACT SOMEONE ABOUT THIS POLICY, PLEASE CONTACT YOUR HARTFORD PRODUCER. If you have additional questions, you may contact The Hartford at the address stated on the Declarations Page.

If you have been unable to contact or obtain satisfaction from your producer or from The Hartford's servicing office, Part 919 of the Rules of the Illinois Department of Insurance requires that The Hartford advise you that, if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at:

ILLINOIS DEPARTMENT OF INSURANCE
Consumer Division
122 S. Michigan Ave., 19th Floor
Chicago, Illinois 60603

and in Springfield at:

ILLINOIS DEPARTMENT OF INSURANCE
Consumer Division
320 West Washington Street
Springfield, Illinois 62767

Written correspondence is preferable so that a record of your inquiry is maintained.

**PLEASE MAKE SURE TO INCLUDE YOUR POLICY NUMBER IN ANY CORRESPONDENCE.**

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**27

**This endorsement, effective 12:01 am,** 5/17/19                                         **forms part**
**of policy number**      83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**              TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CONSENT TO USE OF DEFENSE COUNSEL FOR EPL CLAIMS - NO CLASS ACTIONS

This endorsement modifies insurance provided under:

**PRIVATE CHOICE PREMIER<sup>SM</sup> POLICY**

**COMMON TERMS AND CONDITIONS**, section **VII. DEFENSE AND SETTLEMENT**, is amended by the addition of the following:

- To the extent a defense is to be provided by the Insurer for a **Claim** covered solely under the **EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, the Insurer consents to the use of the following counsel (hereinafter referred to as "Insured's Defense Counsel"):

  Insured's Defense Counsel

  DAVID AND CAMPBELL

  The above consent is subject to the following conditions:

  **(1)** Insured's Defense Counsel shall comply with The Hartford's Litigation Management Program Procedures for Reporting and Billing as well as any other reasonable guidelines promulgated by the Insurer (hereinafter referred to as "Guidelines"). Insurer shall not be liable for any **Defense Costs** that do not conform to such Guidelines.

  **(2)** Insured's Defense Counsel shall adhere to the following rate schedule (hereinafter referred to as "Approved Rates"), and Insurer shall not be liable for any **Defense Costs** that are based on rates charged by Insured's Defense Counsel in excess of the Approved Rates:

|  | Hourly Rate in Dollars | | | |
| --- | --- | --- | --- | --- |
| Insured's Defense Counsel | Senior Partner | Other Partner | Associates | Paralegals |
| David and Campbell | $250 | $250 | $175 | $85 |

**ENDORSEMENT NO:** 27

**(3)** In the event of a conflict of interest that precludes Insured's Defense Counsel from representing one or more **Insureds** in connection with any **Claim**, Insurer shall have the right to select alternative defense counsel for such **Insureds** that Insured's Defense Counsel cannot represent due to the conflict.

**(4)** Insured's Defense Counsel shall not represent the **Insureds** in connection with any coverage issues or disputes related to any **Claim** reported to the Insurer under this Policy.

**(5)** The **Insureds** will not be permitted to use Insured's Defense Counsel to represent them with respect to any **Claim** brought or maintained in a jurisdiction other than <u>IL</u>.

**(6)** Insured's Defense Counsel shall not represent the **Insured** in any purported Class Action or mass action litigation.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

Endorsement No.: 28

| | | |
|---|---|---|
| This endorsement, Effective on | 5/17/19 | at 12:01 A.M. standard time, forms a part of |

Policy No. 83 KB 0336944-19          of the                    TWIN CITY FIRE INSURANCE CO.

Issued to VONACHEN GROUP

*Douglas Elliot*

Douglas Elliot, President

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
## POLICY CHANGE

1. ☐ Policy Premium Changed To: $
2. ☐ Insured's Name Changed To: (see description or endorsement listed below)
3. ☐ Insured's Address Changed To: (see description or endorsement listed below)
4. ☐ Anniversary Date Is Changed To:
5. ☐ Additional Insured(s) or Subject(s) of coverage added
6. ☐ Additional Premium: $
7. ☐ Return Premium: $
8. ☐ Limit of Liability Changed To: $

9. ☐ Deductible/Retention Changed To:
10. ☐ Expiration Date Is Changed To:
11. ☐ Additional Insured(s) or Subject(s) of coverage deleted
12. ☐ Policy Provision(s) Added
13. ☐ Policy Provision(s) Deleted
14. ☐ Exercise Discovery Period, Extended Reporting Period or Tail Coverage Option.
15. ☒ Other (see description or endorsement listed below)

**Description of Policy Changes:**

IT IS HEREBY AGREED AND UNDERSTOOD THAT ENDORSEMENT NO. 27, CONSENT TO USE OF DEFENSE COUNSEL FOR EPL CLAIMS - NO CLASS ACTIONS (PP00H42100), IS DELETED FROM THE POLICY IN ITS ENTIRETY AND REPLACED BY ENDORSEMENT NO. 29.

**Name and number of Endorsement(s) made part of the policy:**

PP00H42100 (REVISED) - CONSENT TO USE OF DEFENSE COUNSEL FOR EPL CLAIMS - NO CLASS ACTIONS - ENDORSEMENT NO. 29.

**ENDORSEMENT NO:**29

**This endorsement, effective 12:01 am,** 5/17/19        **forms part**
**of policy number**     83 KB 0336944-19

**issued to:**        VONACHEN GROUP

**by:**        TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### CONSENT TO USE OF DEFENSE COUNSEL FOR EPL CLAIMS - NO CLASS ACTIONS

This endorsement modifies insurance provided under:

**PRIVATE CHOICE PREMIER<sup>SM</sup> POLICY**

**COMMON TERMS AND CONDITIONS**, section **VII. DEFENSE AND SETTLEMENT**, is amended by the addition of the following:

- To the extent a defense is to be provided by the Insurer for a **Claim** covered solely under the **EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**, the Insurer consents to the use of the following counsel (hereinafter referred to as "Insured's Defense Counsel"):

    Insured's Defense Counsel

    DAVIS AND CAMPBELL

    The above consent is subject to the following conditions:

    (1) Insured's Defense Counsel shall comply with The Hartford's Litigation Management Program Procedures for Reporting and Billing as well as any other reasonable guidelines promulgated by the Insurer (hereinafter referred to as "Guidelines"). Insurer shall not be liable for any **Defense Costs** that do not conform to such Guidelines.

    (2) Insured's Defense Counsel shall adhere to the following rate schedule (hereinafter referred to as "Approved Rates"), and Insurer shall not be liable for any **Defense Costs** that are based on rates charged by Insured's Defense Counsel in excess of the Approved Rates:

| Insured's Defense Counsel | Senior Partner | Other Partner | Associates | Paralegals |
|---|---|---|---|---|
| | | Hourly Rate in Dollars | | |
| Davis and Campbell | $250 | $250 | $175 | $85 |

PP 00 H421 00 0616             © 2016, The Hartford             Page 1 of 2

**(3)** In the event of a conflict of interest that precludes Insured's Defense Counsel from representing one or more **Insureds** in connection with any **Claim**, Insurer shall have the right to select alternative defense counsel for such **Insureds** that Insured's Defense Counsel cannot represent due to the conflict.

**(4)** Insured's Defense Counsel shall not represent the **Insureds** in connection with any coverage issues or disputes related to any **Claim** reported to the Insurer under this Policy.

**(5)** The **Insureds** will not be permitted to use Insured's Defense Counsel to represent them with respect to any **Claim** brought or maintained in a jurisdiction other than <u>IL</u>.

**(6)** Insured's Defense Counsel shall not represent the **Insured** in any purported Class Action or mass action litigation.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:** 29

**This endorsement, effective 12:01 am,**   10/07/19                                   forms part
 **of policy number**   83 KB 0336944-19

**issued to:**          VONACHEN GROUP

**by:**                 TWIN CITY FIRE INSURANCE CO.

## BROKER OF RECORD ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Upon the effective date of this Endorsement, the broker of record for this policy is as follows:

      89808
      KUHL INSURANCE AGENCY INC
      632 WEST JEFFERSON
      MORTON, IL 61550

"Agent", "Agency", "Producer" and "Broker" shall mean the broker of record for this policy.

All other terms and conditions of this policy remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

HG 00 H003 00 0501